**PUBLISH**

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 7 1999**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CHARLES ADRIAN FOSTER,

      Petitioner-Appellant,

v.

RONALD WARD, Warden, Oklahoma
State Penitentiary,

      Respondent-Appellee,

and

W.A. DREW EDMONDSON, Attorney
General, State of Oklahoma,

      Respondent.

No. 97-7086

---

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. 95-CV-304)**

---

Janet G. Chesley (Vicki Ruth Adams Werneke, Assistant Federal Public Defender,
with her on the briefs), Assistant Federal Public Defender, Oklahoma City,
Oklahoma, for Petitioner-Appellant.

Sandra D. Howard (W.A. Drew Edmondson, Attorney General, with her on the
brief), Assistant Attorney General, Oklahoma City, Oklahoma, for Respondent-
Appellee.

---

Before **SEYMOUR, BALDOCK** and **BRORBY**, Circuit Judges.

**BRORBY**, Circuit Judge.

Petitioner Charles Foster appeals the denial of his petition for a writ of habeas corpus seeking to overturn his capital murder conviction and death sentence. We affirm.

BACKGROUND

Mr. Charles Foster was tried in Oklahoma state court on an information alleging first degree murder as well as burglary and larceny. After a two-day trial, a jury convicted Mr. Foster for the murder of Claude Wiley, a seventy-four-year-old grocery store owner who disappeared on April 1, 1983, while making deliveries. Mr. Wiley's last delivery was to the home of Charles and Eula May Foster. His body was discovered near an abandoned house in Muskogee ten days later. Mr. Wiley suffered multiple stab wounds to the chest, blunt force lacerations to the head and face, and an extensive skull fracture.

The State originally charged both Mr. and Mrs. Foster with Mr. Wiley's murder. However, prosecutors later reduced the charge against Mrs. Foster to "accessory after the fact." Mrs. Foster was the State's key witness. She testified

at trial Mr. Foster was hiding behind the front door with a baseball bat when Mr. Wiley first entered their house. After accusing Mr. Wiley of having "something to do" with Mrs. Foster, Mr. Foster pushed Mr. Wiley, repeatedly struck him with the bat, and then wrapped him in a blanket and left in Mr. Wiley's El Camino. Mrs. Foster further testified that Mr. Foster returned home after about forty-five minutes, and then left again fifteen minutes later for approximately one and a half hours. When Mr. Foster returned the second time, he had in his possession a number of items from Mr. Wiley's home. Soon after Mr. Foster's return, the couple fled to Texas in Mr. Wiley's El Camino. Mrs. Foster denied knowing that Mr. Foster intended to attack and kill Mr. Wiley when he delivered the groceries to their house. She further denied ever striking or stabbing Mr. Wiley.

In rebuttal, Mr. Foster testified his wife had sent him to the grocery store around 6:20 p.m. on April 1, 1983. He picked up the groceries she requested and then waited outside the store for awhile because it was raining. He testified that at about 7:50 p.m. his wife came to the grocery store in Mr. Wiley's El Camino. She told him she had borrowed the El Camino and they were going to visit her mother in Texas. Mr. Foster consistently denied any knowledge of Mr. Wiley's murder, but admitted pawning some of Mr. Wiley's possessions at his wife's request.

One of Mr. Foster's former cell-mates, Mr. Jody Lynch, testified during the sentencing stage that Mr. Foster had admitted killing Mr. Wiley and wrapping him in a blanket, and had threatened to kill Mrs. Foster and her family. Mrs. Foster also testified during the sentencing stage. She told the jury of the physical abuse she had suffered at Mr. Foster's hands, and explained that upon her arrest, she asked the police to protect her from Mr. Foster. Detective Grayson corroborated Mrs. Foster's testimony concerning her fear of Mr. Foster.

During the sentencing stage, Mr. Foster told the jury about his family and educational background, his work history, and his prior run-ins with law enforcement. He maintained he did not kill Mr. Wiley and denied admitting the murder to Mr. Lynch. He further denied threatening to kill Mrs. Foster and her family or ever abusing Mrs. Foster. Rather, he claimed Mrs. Foster once stabbed him in the shoulder. Mr. Foster stipulated on the record he had previously been convicted of two felonies involving the use or threat of violence.

After hearing this evidence and considering it together with the evidence presented during the guilt stage of trial, the jury found three aggravating circumstances in support of the death penalty: (1) Mr. Wiley's murder was especially heinous, atrocious or cruel; (2) Mr. Foster posed a continuing threat to

society; and (3) Mr. Foster previously had been convicted of a felony involving the use or threat of violence. Accordingly, on November 28, 1983, the trial court sentenced Mr. Foster to death.

Mr. Foster took a direct appeal to the Oklahoma Court of Criminal Appeals. That court affirmed his conviction and sentence. *Foster v. Oklahoma*, 714 P.2d 1031 (Okla. Crim. App.), *cert. denied*, 479 U.S. 873 (1986). He later filed an application for post-conviction relief in the District Court of Muskogee County. The district court denied relief and was affirmed on appeal to the Oklahoma Court of Criminal Appeals. *Foster v. Oklahoma*, No. PC-87-729 (Okla. Crim. App. May 5, 1988). The United States Supreme Court subsequently granted certiorari and remanded Mr. Foster's case to the Oklahoma Court of Criminal Appeals for reconsideration in light of *Maynard v. Cartwright*, 486 U.S. 356 (1988). *Foster v. Oklahoma*, 488 U.S. 884 (1988). On remand, the Oklahoma court again denied post-conviction relief. *Foster v. Oklahoma*, 779 P.2d 591 (Okla. Crim. App. 1989), *cert. denied*, 497 U.S. 1032 (1990). Mr. Foster filed a second application for post-conviction relief, which was also denied and then affirmed on appeal. *Foster v. Oklahoma*, No. PC-93-1020 (Okla. Crim. App. Jan. 20, 1995). Mr. Foster filed his federal habeas petition in June 1995. The district court denied relief in June 1997, and denied Mr. Foster a certificate of appealability.

Applying *Lindh v. Murphy*, 521 U.S. 320 (1997), we conclude a certificate of appealability is not a jurisdictional requirement in this appeal since Mr. Foster's petition was filed before April 24, 1996, the enactment date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). The version of 28 U.S.C. § 2253 applicable to this appeal requires a certificate of probable cause. In his brief on appeal, Mr. Foster acknowledges this requirement and requests that this court issue a certificate of probable cause. Because we conclude Mr. Foster has made a "substantial showing of the denial of [a] federal right," *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983) (internal quotation marks and citation omitted), we grant a certificate of probable cause and proceed to consider Mr. Foster's petition, applying pre-AEDPA law.

## DISCUSSION

Mr. Foster raises five issues on appeal from the denial of his habeas petition: (1) ineffective assistance of counsel during both the guilt and sentencing stages of trial; (2) denial of a post-examination competency hearing; (3) failure to disclose the true nature of lenient treatment provided Mrs. Foster in exchange for her testimony; (4) failure to instruct the jury regarding Mrs. Foster's status as an accomplice; and (5) unconstitutionality of sentencing stage jury instructions concerning aggravating and mitigating circumstances.

We review the district court's legal conclusions concerning these issues de novo and its factual findings for clear error. *Hill v. Reynolds*, 942 F.2d 1494, 1495 (10th Cir. 1991). Habeas relief must be granted only if the claimed constitutional error "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Kyles v. Whitley*, 514 U.S. 419, 436 (1995) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). If we are in "grave doubt" about whether an error satisfies that standard, then the error cannot be treated as harmless and the petitioner must prevail. *O'Neal v. McAninch*, 513 U.S. 432, 437-38 (1995).

I. Ineffective Assistance of Counsel

Mr. Foster's ineffective assistance of counsel claim presents a mixed question of fact and law we review de novo. *Williamson v. Ward*, 110 F.3d 1508, 1513 (10th Cir. 1997). To prevail on this claim, Mr. Foster must first demonstrate his counsel "committed serious errors in light of 'prevailing professional norms'" such that his legal representation fell below an objective standard of reasonableness. *United States v. Haddock*, 12 F.3d 950, 955 (10th Cir. 1993) (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)). If Mr. Foster demonstrates constitutionally deficient performance, he must then show prejudice – "a 'reasonable probability' that the outcome would have been

-7-

different had those errors not occurred." *Haddock*, 12 F.3d at 955 (quoting *Strickland*, 466 U.S. at 694). This court may address the performance and prejudice components in any order, but need not address both if Mr. Foster fails to make a sufficient showing of one. *Strickland*, 466 U.S. at 697.

Because we can fully resolve Mr. Foster's ineffective assistance of counsel claim on the record before us, we conclude he is not entitled to an evidentiary hearing on this issue as he suggests. *See Shillinger v. Haworth*, 70 F.3d 1132, 1138 (10th Cir. 1995); *Scrivner v. Tansy*, 68 F.3d 1234, 1242 (10th Cir. 1995), *cert. denied*, 516 U.S. 1178 (1996).

A.    Guilt Stage

Mr. Foster complains he was prejudiced at the guilt stage of his trial by his counsel's failure to investigate and discover available witnesses to support his alibi defense, request a post-examination competency hearing, adequately advise him whether to testify on his own behalf, request an accomplice instruction, object to the alibi instruction, and object to the introduction of motel and pawn shop receipts. Mr. Foster further claims prejudice as a result of his counsel's "invitation" to the court to admit Mrs. Foster's written statement to police into evidence. We consider each alleged instance of ineffective assistance in turn.

1.     Alibi Witnesses.  Mr. Foster's ineffective assistance of counsel claim centers in large part on his allegation that trial counsel failed to investigate and discover witnesses who would have supported his alibi defense.  Specifically, Mr. Foster proffers the affidavits of Ms. Cecille Fuller and Mr. Alvin Williams, two individuals who worked at Weddles grocery store – the grocery store Mr. Foster claims to have been at when Mr. Wiley was murdered.  According to Mr. Foster, "[t]his impartial testimony unquestionably would have had an effect on [his] jury."

Both Ms. Fuller's and Mr. Williams' affidavits were prepared ten years after Mr. Foster's trial, thus raising questions as to their veracity.  However, since the State has not rebutted either affidavit, we will treat the factual allegations contained therein as true.  *See Williamson*, 110 F.2d at 513.  Moreover, we assume without deciding that it is unreasonable for counsel not to attempt to identify and contact alibi witnesses to ascertain whether their testimony would aid the defense, and because the record offers no explanation as to why defense counsel did not identify or interview these alibi witnesses, we will assume for purposes of our analysis that defense counsel was constitutionally ineffective for failing to investigate and present available alibi testimony.

This does not end our inquiry, however. Under the holding in *Strickland*, Mr. Foster cannot prevail on his ineffective assistance of counsel claim unless he establishes prejudice in addition to constitutionally deficient performance. *Strickland*, 466 U.S. at 693 (defendant is required to "affirmatively prove prejudice"). We proceed, then, to determine whether Mr. Foster has demonstrated a reasonable probability that, but for his counsel's failure to interview and call alibi witnesses, he would have been acquitted. *See Strickland*, 466 U.S. at 694; *Lawrence v. Armontrout*, 31 F.3d 662, 667-68 (8th Cir. 1994); *cert. denied*, 513 U.S. 1161 (1995). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Considering the totality of the evidence before the jury in this case, *id*. at 695, we conclude defense counsel's omission of alibi evidence does not undermine our confidence in the guilty verdict.[1] This is not a case in which

---

[1] The dissent touts "case law and common sense" as its basis for departure from this conclusion. "Case law and common sense" is not the standard Mr. Foster must meet to secure habeas relief. Rather, he must present evidence which, when weighed against the totality of the prosecution's evidence, undermines our confidence in the jury's verdict, *in this case*. *Strickland*, 466 U.S. at 694. To be sure, other courts have considered the prejudicial effect of alibi testimony that could have been, but was not presented at trial. Some have found the failure to produce available alibi testimony prejudicial. Others have not. None have adopted a per se rule. Indeed, upon critical examination it is patently clear each case is decided on its own unique set of facts, applying the very standard the majority applies here. *See, e.g., Brown v. Meyers*, 137 F.3d 1154,

counsel presented no alibi defense.  Mr. Foster himself testified that at his wife's request he walked from his home to Weddles grocery store, soon after he and his wife got home from shopping together at that same store.  He left home at about 6:20 p.m., arrived at the store at about 6:40 p.m., bought mushrooms, lettuce, and tomatoes, and then remained in the store for about thirty-five to forty minutes waiting for the rain to stop.[2]  According to Mr. Foster, Mrs. Foster picked him up in front of Weddles grocery store in Mr. Wiley's El Camino truck.  There were suitcases in the front of the truck and "other stuff" covered by a blanket in the

---

1156-58 (9th Cir. 1998) (court found prejudice in light of inconsistencies in the prosecution's evidence and multiple alibi witnesses who would have conclusively placed the defendant at another location.); *Lawrence v. Armontrout*, 31 F.3d 662, 666-68 (8th Cir. 1994) (court found no prejudice from failure to present alibi testimony of three witnesses, expressly rejecting defendant's argument that prejudice is established whenever a habeas petitioner's alibi witness testifies to a fact which, if fully believed, would be inconsistent with the petitioner's guilt.); *Kubat v. Thieret*, 867 F.2d 351, 362-63 (7th Cir. 1989) (court found no prejudice from failure to present multiple alibi witnesses where prosecution presented significant evidence to corroborate the testimony of its chief witness, an accomplice to the murder.); *Montgomery v. Peterson*, 846 F.2d 407, 415-16 (7th Cir. 1988) (prejudice was established where defendant was tried in two counties for two burglaries that occurred on same day.  In the first trial defense counsel called an alibi witness and defendant was acquitted.  Defense counsel conducted the second trial in the same manner, except that he failed to call the same alibi witness.  Defendant was convicted in the second trial.); *United States v. Kleba*, 796 F.2d 947, 957 (7th Cir. 1986) (court found no prejudice under circumstances where if defendant left alibi witnesses' apartment ten minutes earlier than she alleged in her affidavit, he would have had ample time to commit the crimes).

   [2]  On cross-examination, Mr. Foster stated he remained in the store for about fifteen or twenty minutes then waited outside.

back end. Mrs. Foster told Mr. Foster they were going to Texas to visit her mother. Mr. Foster denied any knowledge of Mr. Wiley's murder in the Foster's home.

Ms. Fuller's affidavit largely parrots, and is therefore cumulative of, Mr. Foster's testimony.[3] Accordingly, the real value of Ms. Fuller's testimony to the defense is that of corroboration by what appears to be a disinterested witness. While we do not discount that value, after weighing the materiality and probable effect of Ms. Fuller's testimony against the strength of the prosecution's case, *id.* at 694, we conclude the mere possibility that Ms. Fuller's testimony could reflect on Mr. Foster's credibility is insufficient to satisfy the "reasonable probability" standard. Ms. Fuller's affidavit adds nothing in terms of details sufficient to

---

[3] In sum, Ms. Fuller stated under oath that: she prepared her affidavit at the request of the attorney representing Mr. Foster in his post-conviction relief petition; she worked as a cashier at Weddles grocery store in April 1983; she was seventeen years old at that time; she remembered Charles Foster shopping at Weddles grocery store and "always buying diapers"; she last saw Mr. Foster on "Good Friday before Easter in April of 1983," first, in the afternoon with a "heavy set black woman" who "tried to cash her welfare check," and later in the evening (between 6 p.m. and 7 p.m.), alone; when Mr. Foster returned that evening he bought diapers, lettuce and tomatoes; she gave him an extra paper sack for his head because it was raining and told him he could wait in front of the store until the rain quit; Mr. Foster was in the store approximately forty-five minutes; she saw an "El Camino or Ranchero type vehicle" with furniture in the back pull in front of the store and Mr. Foster left.

strengthen Mr. Foster's alibi or otherwise create a reasonable doubt as to Mr. Foster's guilt.[4] The time frames Ms. Fuller recalls Mr. Foster being in the store on the evening of Mr. Wiley's murder are general and simply do not preclude the possibility of his involvement in the murder. Moreover, we cannot ignore the fact Ms. Fuller's recollection some ten years after Mr. Wiley's murder would be subject to intense cross-examination at trial. Finally, we give little if any weight to Mr. Williams' affidavit, which offers no alibi evidence but merely vouches for Ms. Fuller's good memory and tendency to talk to "everybody including Charles Foster." *See United States v. Charley*, ___ F.3d ___, ___, 1999 WL 285879 *12 (10th Cir. May 7, 1999).

We admit this is a closer case than some since the State's only eyewitness was an accomplice; nonetheless, the prosecution did present strong circumstantial evidence of Mr. Foster's guilt. Specifically, the prosecution placed Mr. Wiley in the Fosters' home at the time of his murder. The investigating officers, forensic

---

[4] Indeed, to the extent Ms. Fuller recalls details, they are not entirely consistent with Mr. Foster's version of the events. For example, Ms. Fuller states she remembers Mr. Foster buying "diapers, lettuce and tomatoes." Mr. Foster testified he bought "[j]ust the mushrooms, lettuce, tomatoes." Ms. Fuller recalled seeing furniture in the back of the vehicle that pulled up in front of Weddles grocery store before he left. Mr. Foster testified the "stuff" in the back was covered with a blanket.

dentist and medical examiner described in detail the nature of the crime scene and injury to Mr. Wiley. The jury certainly could conclude from the force with which Mr. Wiley was beaten, the fact the Fosters' blood-stained sofa had been moved across the room and stood on end, and the removal and concealment of Mr. Wiley's body, that Mrs. Foster could not have acted alone in this crime while Mr. Foster was picking up a few groceries. Importantly, Mrs. Foster's testimony concerning how Mr. Foster killed Mr. Wiley was consistent with the rest of the prosecution's evidence and remained consistent from the time she was arrested to Mr. Foster's trial. Finally, the jury could infer guilt from the fact that, despite his proclaimed innocence, Mr. Foster ran from police when they apprehended Mrs. Foster in Ft. Worth, Texas.[5] Because we conclude there is no reasonable probability additional evidence pertaining to Mr. Foster's alibi defense would have created a reasonable doubt respecting his guilt, *see Strickland*, 466 U.S. at 695, Mr. Foster has failed to satisfy the constitutional standard. We therefore deny his request for habeas relief on this claim.

---

[5] The dissent completely ignores the relevance of this evidence. *See, e.g., United States v. Lacey*, 86 F.3d 956, 973 (10th Cir.), *cert. denied*, 519 U.S. 944 (1996).

2.      Post-Examination Competency Hearing.  As discussed in Part II below, Mr. Foster's claim he was entitled to a post-examination competency hearing is without merit.  Thus, his claim that counsel was ineffective for failing to request such a hearing likewise fails.  *Cf. Cooks v. Ward*, 165 F.3d 1283, 1296-97 (10th Cir. 1998) (counsel's failure to pursue nonmeritorious issues on appeal does not constitute ineffective assistance), *petition for cert. filed* (U.S. May 14, 1999) (No. 98-9420).

3.      Mr. Foster's Decision to Testify.  Mr. Foster asserts his trial counsel "failed to provide [him] with any advice on whether he should testify in his own defense."  The record plainly refutes this frivolous claim.  As the district court noted, the record demonstrates Mr. Foster's counsel advised him of his options and the possible effects of each option, and then gave him time by himself to think about whether he wanted to testify.  When asked by the trial judge whether he understood he had the right to remain silent and hold the State to its burden of proving his guilt beyond a reasonable doubt, Mr. Foster said, "yes."  Mr. Foster also stated he understood if he chose to testify, the State would have the opportunity to call rebuttal witnesses and could inquire as to his previous convictions.  Mr. Foster assured the court no one was putting any pressure on him to testify or recommending that he not take the witness stand.  Accordingly, we

find no factual support for Mr. Foster's claim his counsel failed to advise him on whether to testify, and certainly no evidence of prejudice.

4.      Accomplice Instruction.  For the reasons discussed in Part IV below, Mr. Foster cannot obtain habeas relief by claiming he was entitled to a cautionary instruction regarding Mrs. Foster's testimony.  For those same reasons he cannot prevail on his claim his counsel was ineffective for failing to request such an instruction.  *Cf. Cooks*, 165 F.3d at 1296-97.

5.      Alibi Instruction.  Mr. Foster complains he "was deprived of a fair and impartial trial because the alibi instruction did not allocate the burden of proof properly."  According to Mr. Foster, the instruction "did not place the burden of proof squarely on the shoulders of the prosecution," as required by Oklahoma law.  He thus asserts his trial counsel was ineffective for failing to object to the instruction given.

> The court instructed the jury, in relevant part:
>
> The law is that [the alibi] defense is proper and legitimate and you should consider all of the evidence bearing thereon, whether introduced by the State or by the defendant, and if after a careful consideration of all of the evidence in the case you entertain a reasonable doubt as to whether the defendant was present at the time and place where the crime was committed, if it was committed, then

and in that event the jury should give the defendant the benefit of the doubt and acquit him.

The court also instructed the jury:

> The defendant is presumed innocent of the crimes charged, and the presumption continues unless, after consideration of all the evidence, you are convinced of his guilt, beyond a reasonable doubt. The State has the burden of presenting the evidence that established guilt beyond a reasonable doubt. The defendant must be found not guilty unless the State produces evidence which convinces you beyond a reasonable doubt of each element of the crimes.

The instructions pertaining to the specific crimes with which Mr. Foster was charged reemphasized the prosecution's burden of proof beyond a reasonable doubt.

In habeas proceedings, we will set aside a state court conviction based on an erroneous jury instruction only if the erroneous instruction rendered the trial so fundamentally unfair as to deny the petitioner a fair trial and due process of law. *Tyler v. Nelson*, 163 F.3d 1222, 1227 (10th Cir. 1999). The jury instructions in this case, read together, quite obviously and appropriately placed the burden on the prosecution to prove Mr. Foster's guilt beyond a reasonable doubt. We fail to see how the instructions in any way undermined the jury's responsibility to find the ultimate facts beyond a reasonable doubt. Accordingly, the instructions did not render Mr. Foster's trial fundamentally unfair. Mr. Foster's ineffective assistance claim pertaining to the alibi defense instruction fails.

-17-

6.	Admission of Motel and Pawn Shop Receipts.  Mr. Foster asserts his trial counsel should have raised a hearsay objection to the State's admission of a receipt from the Jackson Motel in Denison, Texas, showing a registration to "Charles Jackson," as well as a receipt from the AAA Trading Post in Denison showing "Clifton Foster" pawned a television stand, two lamps, a radio, and a watch.  He claims "[t]he admission of this evidence was highly prejudicial, because it was used by the prosecution in closing argument in an effort to show [he] was being untruthful."

It is precisely because the prosecution used this evidence to attack Mr. Foster's credibility, not to prove he checked into the Jackson Motel and pawned Mr. Wiley's belongings, that Mr. Foster's claim must fail.  The prosecution clearly used the motel registration and pawn shop receipt to show the jury Mr. Foster lied about his name shortly after the murder, yet claimed he didn't know anything had happened to Mr. Wiley.  Evidence presented to impeach the witness rather than establish the truth of the matter asserted is not hearsay.  *See* Fed. R. Evid. 801(c); *Foster v. General Motors Corp.*, 20 F.3d 838, 839 (8th Cir. 1994).  Thus, Mr. Foster's counsel cannot be said to have been ineffective for failing to make a hearsay objection.

If defense counsel had a sustainable objection to such evidence, it probably would have been an objection for lack of foundation. The crux of Mr. Foster's challenge to the admission of the motel registration and pawn shop receipt is that the documents were admitted without a sponsoring witness. However, even assuming counsel should have objected to the admission of the receipts due to lack of foundation, we find no prejudice. Although Mr. Foster did not admit using aliases, he testified he and Mrs. Foster stopped at the Jackson Motel in Denison, and he was the one who went in and registered. He further admitted pawning Mr. Wiley's property in Denison. Mrs. Foster corroborated these facts and specifically identified the motel registration. Under these circumstances, we conclude there is no reasonable probability the jury would have reached a different result had Mr. Foster's counsel objected to the introduction of the motel and pawn shop receipts into evidence.

7. Admission of Mrs. Foster's written statement. Mr. Foster also challenges his counsel's suggestion that, rather than adopt the prosecution's conclusion that Mrs. Foster's written statement and trial testimony were consistent, the jury should read Mrs. Foster's written statement to determine whether it differed from her trial or preliminary hearing testimony. According to Mr. Foster, that suggestion invited the admission of Mrs. Foster's written

statement, which contained prejudicial hearsay statements Mr. Foster's relatives made after Mr. Wiley's murder, and hearsay evidence of prior crimes.

Without ruling on whether trial counsel's conduct was ineffective or whether Mrs. Foster's written statement was admissible evidence, we conclude Mr. Foster suffered no prejudice as a result of that statement being introduced into evidence. Like the district court, we simply do not believe the arguably inadmissible portions of Mrs. Foster's statement had any impact on the jury's verdict. The written statement notwithstanding, the jury heard admissible testimony from Mrs. Foster concerning Mr. Foster's history of domestic violence, his role in Mr. Wiley's murder, and the circumstances surrounding the couple's flight from Oklahoma. Mr. Foster availed himself of the opportunity to rebut Mrs. Foster's claims when he took the stand. Under these circumstances, we find no basis for habeas relief on this claim.

B.    Sentencing Stage

At the sentencing stage, Mr. Foster asserts he was prejudiced by his counsel's failure to investigate, discover, prepare, and present mitigation evidence. Specifically, he claims the jury would not have sentenced him to death if, during the sentencing stage, his counsel would have presented to the jury (1)

evidence pertaining to Mr. Foster's tragic familial and societal background, including his mental retardation and brain damage; (2) the testimony of Cora Washington, his ex-wife; and (3) the testimony of Billy Dixon, a cell-mate of Mr. Foster's and State's witness, Mr. Lynch.

Without deciding whether Mr. Foster's trial counsel was ineffective for failing to investigate, prepare or present potential mitigation evidence at the sentencing stage, we conclude Mr. Foster has failed to demonstrate a reasonable probability that the above-referenced evidence would have changed the jurors' minds. We have on numerous occasions determined that evidence of a troubled childhood involving physical, emotional, sexual and/or substance abuse does not outweigh evidence supporting the conviction and evidence supporting multiple aggravating circumstances; nor does evidence of low I.Q. and/or organic brain damage. *See, e.g., Cooks*, 165 F.3d at 1293-96; *Castro v. Ward*, 138 F.3d 810, 831-32 (10th Cir.), *cert. denied*, 119 S. Ct. 422 (1998); *Nguyen v. Reynolds*, 131 F.3d 1340, 1347-49 (10th Cir. 1997), *cert. denied*, 119 S. Ct. 128 (1998). Mr. Foster has not shown his case is an exception. Indeed, while there may have been additional available mitigating evidence, Mr. Foster took the witness stand on his own behalf and told the jury he was the second oldest of approximately nineteen children and left school after the eighth grade to join the Job Corps in order to

help take care of his parents.  The jury nevertheless sentenced Mr. Foster to death.

We further conclude neither Ms. Washington's nor Mr. Dixon's testimony would have changed the result.  Mr. Foster claims Ms. Washington was willing to testify that he had told her Mrs. Foster had killed a man and then "lied on him," and that during the seven years they were married he was always employed and never physically violent.  Such testimony would have been largely cumulative to Mr. Foster's testimony.  Mr. Foster told the jury in no uncertain terms that Mrs. Foster's testimony was not true.  He also told the jury he was not violent with Mrs. Foster except on one occasion when she attempted to stab him.  Mr. Foster further testified as to his work history.  Under the circumstances, we believe Ms. Washington's testimony would have added little if anything to Mr. Foster's defense.

Mr. Dixon would have testified he never heard Mr. Foster discuss his case with anyone, especially Mr. Lynch, who was white.  However, such testimony actually would have contradicted Mr. Foster's admission that he did, in fact, speak to Mr. Lynch "once or twice" while they were in the same jail "tank."  Mr. Foster testified he told Mr. Lynch about the charges he faced.  Consequently, we

-22-

doubt the jury would have given Mr. Dixon's testimony any weight whatsoever.

In sum, the evidence against Mr. Foster, the number of aggravating factors found by the jury, and the nature of Mr. Wiley's murder leaves little doubt the mitigating evidence Mr. Foster relies on would not have changed the jury's decision to impose the death penalty. Because Mr. Foster fails to satisfy *Strickland's* prejudice requirement, we deny his request for habeas relief on this ground.

## II. Post-Examination Competency Hearing

Mr. Foster claims that although he was evaluated at Eastern State Hospital and determined by the chief forensic psychiatrist to be competent to stand trial, Oklahoma law nevertheless entitled him to a post-examination hearing and judicial determination of competency prior to trial. According to Mr. Foster, the trial court's failure to conduct a post-examination hearing deprived him of his constitutional right not to be tried while incompetent – a due process right which cannot be waived. Because Mr. Foster does more than challenge a factual competency determination, we are not limited by the clearly erroneous standard. Rather, we review his competency claim de novo. *See United States v. Williams*, 113 F.3d 1155, 1160 (10th Cir. 1997).

On its face, Mr. Foster's brief raises a single constitutional due process claim. On closer examination, however, we interpret Mr. Foster's argument to incorporate two distinct claims. First, Mr. Foster argues he was improperly denied a post-examination competency hearing as provided by Oklahoma statute. Second, he argues his federal due process rights were violated when he was tried even though a doubt existed as to his competency. We consider each claim in turn.

At the time of Mr. Foster's trial, Oklahoma law required that a post-examination hearing be held in every case in which a competency examination was conducted, whether or not the defendant requested such a hearing. *See Scott v. Oklahoma*, 730 P.2d 7 (Okla. Crim. App. 1986) (applying Okla. Stat. tit. 22, § 1175.4(A) (1981)).[6] There is no dispute Mr. Foster did not request, and was not afforded, a post-examination competency hearing. Nevertheless, the Oklahoma Court of Criminal Appeals and the federal district court each concluded since Mr. Foster failed to raise this claim on direct appeal, he waived his right to assert it in

---

[6] This law has since changed to require a post-examination competency hearing "'only upon application of the defendant or the state or upon the formal setting of a competency hearing by the court.'" *Le v. Oklahoma*, 947 P.2d 535, 544-45 (Okla. Crim. App. 1997) (quoting Okla. Stat. tit. 22, § 1175.4(A) (1991)), *cert. denied*, 118 S. Ct. 2329 (1998).

his application for post-conviction relief or habeas petition. Mr. Foster argues the Constitution prohibits the waiver of such a right.

Indeed, the general rule barring our consideration of issues not raised on direct appeal does not apply to substantive mental competency claims. *See Nguyen*, 131 F.3d at 1346. Mr. Foster's first competency claim cannot, however, fairly be characterized as a substantive mental competency claim. The post-examination competency hearing he was denied is a creation of state statute. Federal law mandates that a criminal defendant may not be tried while incompetent, *Godinez v. Moran*, 509 U.S. 389, 396 (1993); *Drope v. Missouri*, 420 U.S. 162 (1975); it does not mandate that state courts provide a post-examination competency hearing. Thus, Mr. Foster's first claim is best characterized as a state procedural claim. As such, we conclude the state court's decision to bar that claim from further review, as it consistently does with all claims that could have been raised on direct appeal, was based on adequate state law grounds, independent of any mental competency claim grounded in the federal constitution. In other words, to the extent the state court deemed Mr. Foster's competency claim procedural and not substantive, we agree it was defaulted unless Mr. Foster can demonstrate cause for his failure to raise the claim on direct appeal, and actual prejudice resulting from such failure. He

makes no such showing. We therefore deny relief on his procedural competency claim and proceed to consider the merits of his second claim.

The trial of an incompetent defendant violates federal substantive due process rights. *Nguyen*, 131 F.3d at 1346 (citing *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996)). Thus, Mr. Foster's second competency claim is substantive in nature and cannot be barred from review by this court. However, having carefully reviewed the record, we find no support for Mr. Foster's claim he was tried and convicted while a serious doubt existed as to his competency.

"Competence to stand trial requires that a defendant have 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and 'a rational as well as factual understanding of the proceedings against him.'" *Nguyen*, 131 F.3d at 1346 (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960)). Although the trial court found sufficient doubt as to Mr. Foster's competency to grant his request for a psychological evaluation, that initial doubt was dispelled by the State Hospital's conclusion Mr. Foster was indeed capable of understanding the exact nature of the proceedings against him and would be able to adequately advise and assist legal counsel. The record establishes Mr. Foster did, in fact, consult with his lawyer and had both a rational

and factual understanding of the proceedings against him. Most telling is the fact Mr. Foster took the witness stand and testified in his own defense. Mr. Foster's behavior on the stand was neither irrational nor unusual. His testimony was responsive to the questions asked, logical, and coherent. In addition, the trial judge had ample opportunity to assess, first hand, Mr. Foster's ability to understand the proceedings and assist his counsel; the judge indicated no concern as to Mr. Foster's competency. In light of this record, Mr. Foster's proffer of Dr. Patricia Fleming's opinion (based on her evaluation of Mr. Foster ten years after his trial) that Mr. Foster was unable to provide the necessary assistance to his attorney to aid in his defense, simply does not "'positively, unequivocally and clearly generate a real, substantial and legitimate doubt concerning his mental capacity.'" *Nguyen*, 131 F.3d at 1346 (quoting *Carter v. Johnson*, 110 F.3d 1098, 1106 (5th Cir. 1997)). For this reason, we deny relief on Mr. Foster's substantive mental competency claim.

### III. Failure to Disclose the Nature of Mrs. Foster's "Deal"

The State initially charged Mrs. Foster with the same crimes charged against Mr. Foster: murder, second degree burglary, larceny of an automobile and grand larceny. After Mrs. Foster's preliminary hearing, the State reduced the charges against her to accessory after the fact. Mrs. Foster pleaded guilty to

being an accessory after the fact and was sentenced to three concurrent five-year terms, with two and one-half years suspended. The state court received Mrs. Foster's plea and sentenced her prior to Mr. Foster's trial.

At Mr. Foster's trial, Mrs. Foster acknowledged her charges had been reduced. She further testified she provided a written a statement the day after her arrest and prior to the reduction of her charges. That statement, which implicated Mr. Foster as the murderer, was consistent with her preliminary hearing testimony and her trial testimony. Mrs. Foster stated she had not been offered anything in return for her written statement, no one told her how many years imprisonment she might receive based on her statement, and no one told her what charges she would have to plead guilty to in return for writing the statement. Defense counsel thoroughly cross-examined Mrs. Foster on this issue at trial.

On appeal, Mr. Foster claims Mrs. Foster ultimately was released from custody after serving less than nine months in prison. He alleges the State failed to disclose to him the true nature of Mrs. Foster's "deal," thereby denying him due process of law in accordance with *Brady v. Maryland*, 373 U.S. 83 (1963) and

*Giglio v. United States*, 405 U.S. 150 (1972).[7] Mr. Foster bears the burden of presenting evidence to establish a *Brady* or *Giglio* violation. *United States v. Gonzalez-Montoya*, 161 F.3d 643, 649 (10th Cir. 1998), *cert. denied*, 119 S. Ct. 1284 (1999). We review such claims de novo. *Id*.; *United States v. Molina*, 75 F.3d 600, 602 (10th Cir.), *cert. denied*, 517 U.S. 1249 (1996).

Mr. Foster's claim the State denied him due process of law and the right to confront witnesses against him by affirmatively misleading the jury about implied or direct promises to Mrs. Foster is not supported by the record. The record makes clear that Mrs. Foster provided a statement implicating Mr. Foster prior to any reduction of her charges and without inducement by the State. Her testimony at trial did not vary from that statement; thus, we have no reason to believe the prosecution needed to make a deal with Mrs. Foster in order to make its case. Moreover, defense counsel had a full and fair opportunity to cross-examine Mrs.

---

[7] In his habeas petition, Mr. Foster couched this claim in the context of an unconstitutional denial of his request for an evidentiary hearing to determine whether the State offered promises of leniency to Mrs. Foster. Because he does not assert an entitlement to an evidentiary hearing on appeal, the State argues Mr. Foster has waived this claim. While we are puzzled as to why Mr. Foster has recharacterized his claim, we conclude he provided sufficient notice to the district court of his claim the State denied him due process of law by failing to reveal the true nature of promises made to Mrs. Foster to preserve the issue on appeal. We note, however, that in light of the clarity of the record as discussed above, Mr. Foster was not entitled to an evidentiary hearing to further develop this claim.

Foster on this issue. While Mr. Foster alleges Mrs. Foster provided testimony in exchange for a reduction of charges and lenient sentence, he provides absolutely no factual support to rebut those facts of record which show Mrs. Foster's testimony was not conditioned on any promises of leniency. We fail to see how the fact Mrs. Foster filed an application for post-conviction relief which led to her early release from prison otherwise supports Mr. Foster's claim, even if the government was aware of that possibility and did not oppose her application.

We find no evidence the prosecution suppressed material, exculpatory evidence. The jury knew (1) the prosecution had reduced the charges against Mrs. Foster, (2) she pleaded guilty to being an accessory to Mr. Wiley's murder, and (3) she was sentenced to serve time in prison as a result of her participation in that crime. The fact Mrs. Foster ultimately did not have to serve her full sentence and the government did not oppose her early release simply does not give rise to a *Brady* or *Giglio* claim. *Cf. Molina*, 75 F.3d at 602 (the fact witnesses were allowed to plead on favorable terms subsequent to trial is not evidence the plea agreements were secretly reached prior to the witnesses' testimony and improperly withheld from the defense). Moreover, while we acknowledge Mrs. Foster was a key witness for the prosecution and her credibility was an important issue, *see Giglio*, 405 U.S. at 154-55, we believe any additional

evidence as to the possibility she would be released from prison prior to completing her full sentence would have been cumulative to her testimony on direct and cross-examination, and would have provided only marginal additional support to Mr. Foster's defense. *See United States v. Trujillo*, 136 F.3d 1388, 1393-94 (10th Cir.), *cert. denied*, 119 S. Ct. 87 (1998). This is particularly true in light of the fact the government's case against Mr. Foster did not depend solely on Mrs. Foster's testimony. Mr. Lynch's testimony concerning Mr. Foster's jail cell admissions, the investigating officers' testimony concerning the crime scene, and the fact Mr. Foster ran away when the police approached his car in Texas, all provided additional persuasive evidence to support the conviction and sentence. *Cf. Giglio*, 405 U.S. at 154-55 (new trial granted where government admitted failing to disclose promise made to witness, and where the government's case depended almost entirely on that witness' testimony).

Finally, even if a *Brady* or *Giglio* violation occurred in connection with the full disclosure of Mrs. Foster's "deal," we conclude there was no reasonable probability that had the jury been informed Mrs. Foster would be released from prison after serving only nine months, it would have reached a different result. As previously noted, Mrs. Foster did not provide the only evidence against Mr. Foster. The government presented ample additional evidence to support his

conviction and sentence.  Under these circumstances, we conclude Mr. Foster suffered no prejudice as a result of any failure to disclose knowledge Mrs. Foster would likely obtain an early release from prison.  *See Newsted v. Gibson*, 158 F.3d 1085, 1097 (10th Cir. 1998), *cert. denied*, 119 S. Ct. 1255 (1999); *Banks v. Reynolds*, 54 F.3d 1508, 1517 (10th Cir. 1995) (court must consider the cumulative impact of the evidence, in light of the entire record, including its utility to the defense and its potentially damaging impact on the prosecution's case).  His request for habeas relief on this ground therefore is denied.

IV.  Failure to Instruct Regarding Accomplice Testimony

Mr. Foster claims his Sixth, Eighth and Fourteenth Amendment rights were violated when he was denied protection under Oklahoma law from being convicted on the uncorroborated testimony of an accomplice.  Mr. Foster alleges the evidence at trial established that his wife was an accomplice "as a matter of law," and that without her testimony he never would have been convicted of first-degree murder.  Thus, according to Mr. Foster, he was entitled to a cautionary instruction concerning Mrs. Foster's status as an accomplice, notwithstanding defense counsel's failure to request such an instruction.

Even though Mr. Foster cites us to Oklahoma law requiring the

corroboration of accomplice testimony, our habeas review is governed by federal constitutional principles, not state law.  "The Constitution does not prohibit convictions based primarily on accomplice testimony."  *Scrivner v. Tansy*, 68 F.3d 1234, 1239 (10th Cir. 1995), *cert. denied*, 516 U.S. 1178 (1996).  As there is no constitutional requirement that Mrs. Foster's testimony be corroborated, we need not address his claimed deprivation of protection under state law.

Furthermore, while "[w]e have held that failure to instruct on uncorroborated accomplices' testimony constitutes plain error," *United States v. Hill*, 627 F.2d 1052, 1053 (10th Cir. 1980), this court has never considered such an instruction constitutionally mandated.  *See Scrivner*, 68 F.3d at 1239.  Mr. Foster has not cited, nor have we found, any case that imposes a cautionary instruction as a constitutional requirement.  *Cf. Cool v. United States*, 409 U.S. 100, 103 (1972) (accomplice instructions "represent no more than a commonsense recognition that an accomplice may have a special interest in testifying, thus casting doubt upon his veracity"); *United States v. Nolte*, 440 F.2d 1124, 1126 (5th Cir.) ("the trial judge's decision whether to give the [accomplice credibility] instruction is not a matter requiring constitutional scrutiny"), *cert. denied*, 514 U.S. 1115 (1995).  Accordingly, in the habeas context, Mr. Foster's burden in attacking his conviction and sentence based on an erroneous omission of the

cautionary jury instruction is a heavy one – "even greater than the showing required to establish plain error on direct appeal." *Maes v. Thomas*, 46 F.3d 979, 984 (10th Cir. 1995) (internal quotation marks and citation omitted). We may set aside his conviction on this ground only if, in the context of the entire trial, the failure to instruct the jury to carefully consider Mrs. Foster's credibility as an accomplice "had the effect of rendering the trial so fundamentally unfair as to cause a denial of a fair trial." *Id*. at 984. Mr. Foster fails to satisfy that standard.

Mr. Foster's claim is based, in large part, on an assumption that the testimony of an accomplice should seldom, if ever, be believed. That is not the law in this circuit. *United States v. Torres*, 53 F.3d 1129, 1140 (10th Cir.), *cert. denied*, 515 U.S. 1152, 516 U.S. 883 (1995). "[S]o long as the testimony is not incredible on its face and is otherwise capable of establishing guilt beyond a reasonable doubt," it remains solely within the province of the jury to determine the credibility of each witness. *Id*. at 1140. The record demonstrates Mrs. Foster's testimony was both credible and capable of establishing guilt beyond a reasonable doubt. Mr. Foster's trial counsel had ample opportunity to attack Mrs. Foster's credibility and indeed brought to the jury's attention the fact she was not a disinterested witness. Moreover, the court instructed the jury it was their responsibility to determine the credibility of each witness and to weigh the

-34-

testimony considering the bias, interest or prejudice, if any, the witness may have, and the relation of the witness to the parties and any bias or prejudice the witness may have. Under these circumstances, we conclude the trial court's failure to give a cautionary instruction regarding accomplice testimony did not render Mr. Foster's trial fundamentally unfair. *See e.g.*, *Maes*, 46 F.3d at 985.

To the extent Mr. Foster simply challenges the sufficiency of the evidence to support his conviction, we require only that, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Mrs. Foster testified she witnessed Mr. Wiley's murder at the hands of Charles Foster. The jury was entitled to discredit or believe Mrs. Foster's testimony. Likewise, the jury was entitled to discredit or believe Mr. Lynch's testimony that Mr. Foster admitted killing "a grocery man." In addition, the jury heard evidence from neighbors who saw Mr. Wiley arrive at the Foster's home the evening he was murdered, police officers who investigated the crime scene and found Mr. Wiley's body, and a forensic doctor and dentist who described the nature of Mr. Wiley's wounds and the force with which those injuries were inflicted. As a matter of federal constitutional law, there was sufficient evidence for the jury to convict Mr. Foster. For all these reasons, we

deny habeas relief on this claim.

## V. Constitutionality of Aggravating and Mitigating Circumstance Instructions

"The constitutional validity of aggravating [circumstances] is a question of law subject to de novo review." *United States v. McCullah*, 76 F.3d 1087, 1107 (10th Cir. 1996), *cert. denied*, 520 U.S. 1213 (1997).

### A. Continuing Threat to Society

Mr. Foster first asserts the "continuing threat" aggravating circumstance is overbroad and unconstitutionally vague as applied in Oklahoma. While Mr. Foster acknowledges this court has rejected similar arguments, *see Castro*, 138 F.3d at 816-17; *Nguyen*, 131 F.3d at 1352-54, he asks this panel to "revisit" the issue. We are not free to revisit the issue. The prior resolution binds this panel. *See United States v. Foster*, 104 F.3d 1228, 1229 (10th Cir. 1997). Accordingly, Mr. Foster is not entitled to habeas relief on this ground.

### B. Heinous, Atrocious or Cruel

Mr. Foster next asserts the "heinous, atrocious or cruel" aggravating circumstance is unconstitutionally vague and overbroad. As Mr. Foster points out, this court previously has addressed this precise issue and consistently has

upheld the heinous, atrocious or cruel aggravator as applied in Oklahoma. *See, e.g., Cooks*, 165 F.3d at 1289-90*; Duvall v. Reynolds*, 139 F.3d 768, 792-93 (10th Cir.), *cert. denied*, 119 S. Ct. 345 (1998). Those cases are dispositive here. Mr. Foster's request for relief on this ground must be denied. *Foster*, 104 F.3d at 1229.

Mr. Foster further argues that even if the jury was properly instructed, there was no evidence at trial the victim was conscious and suffered serious physical abuse. We conclude the record supports the jury's finding that Mr. Wiley experienced conscious physical suffering sufficient to establish torture or serious physical abuse as interpreted by the Oklahoma courts. Mrs. Foster testified that even after Mr. Foster repeatedly struck Mr. Wiley with a baseball bat, Mr. Wiley was still breathing when Mr. Foster wrapped him in a blanket and left the house. Moreover, the medical examiner testified Mr. Wiley had blunt force lacerations to the ear, orbit of the right eye, and top of the head. Mr. Wiley's skull was extensively fractured and he experienced massive hemorrhaging. In addition, the medical examiner testified Mr. Wiley was likely alive when he suffered three stab wounds to the chest. Forensic dentists testified it would have taken a considerable amount of force to knock Mr. Wiley's teeth out in the manner evidenced by the fragments he examined. This evidence amply supports

application of the "heinous, atrocious or cruel" aggravator. Because we hold that aggravator is not unconstitutional on its face or as applied in this case, we deny Mr. Foster's request for habeas relief on this ground.

C. Mitigating Circumstances

Finally, Mr. Foster claims the jury instructions failed to explain to jurors that they were free to consider and give effect to all mitigating circumstances, and did not have to unanimously agree as to the mitigating circumstances. Here again, this court rejected similar arguments in *Cooks*, 165 F.3d at 1290-92, and *Duvall*, 139 F.3d at 791-93. *Cooks* acknowledged that state courts are not constitutionally bound to present instructions concerning mitigating evidence in any particular way. 165 F.3d at 1291. This court need only ensure there is no reasonable likelihood the jury applied the challenged instruction(s) in a way that prevented the consideration of relevant evidence. *Id*. As in *Duvall* and *Cooks*, the instructions pertaining to the consideration of mitigating circumstances in this case, as a whole, did not preclude the jurors from considering and giving effect to any and all mitigating circumstances in Mr. Foster's favor, did not suggest the jurors had to unanimously agree as to those circumstances, and in no way mandated imposition of the death penalty. Accordingly, Mr. Foster is not entitled to habeas relief on this ground.

CONCLUSION

Having given careful consideration to each of Mr. Foster's claims, we find no constitutional error.  We therefore **AFFIRM** his conviction and sentence.

**No. 97-7086, Foster v. Ward.**

**SEYMOUR, Chief Judge, dissenting.**

The majority concludes Mr. Foster was not prejudiced by his counsel's failure to investigate and present the testimony of a disinterested witness who would have corroborated Mr. Foster's alibi defense. I cannot agree. Case law and common sense reject the notion, espoused by the majority, that such testimony may be dismissed as merely cumulative or because it would have added nothing to Mr. Foster's defense.[1] To the contrary, courts have held under analogous fact situations that because such a disinterested witness might well have swayed the jury, the defense was prejudiced and the defendant deprived of a fundamentally fair trial. Because I am convinced that the same conclusion is required here, I respectfully dissent.

While the majority assumes without deciding that counsel's failure here was constitutionally deficient, there can be little doubt that counsel's performance fell far short of the mark. The missing witness, Ms. Cecille Fuller, was a clerk at Weddles grocery store who stated by affidavit that she remembered Mr. Foster's visit to the store on the day of the crime and would have been willing to testify if

---

[1] I find it odd the majority would state that case law and common sense are not relevant in deciding whether Mr. Foster is entitled to habeas relief. *See* maj. op. at 11 n.1. An assessment of prejudice that cannot withstand the scrutiny of case law and common sense loses its claim to objective legitimacy and is open to challenge as arbitrary.

asked to do so. Although she described events that are now ten years in the past, her statement is detailed and specific, and corroborates Mr. Foster's trial testimony in virtually all relevant respects. Mr. Foster's counsel knew or certainly should have known that his client would present an alibi defense at trial by testifying that he had been at Weddles at the time of the crime. In view of this knowledge and the fact that alibi was Mr. Foster's only defense, counsel's failure to interview potential witnesses on the matter can hardly be considered a tactical decision entitled to deference.

Indeed, "we have pointed out that in a capital case, counsel's duty to investigate all reasonable lines of defense is strictly observed." *Williamson v. Ward*, 110 F.3d 1508, 1514 (10th Cir. 1997). Moreover, when counsel fails to investigate a defendant's case for purposes of an alibi defense, habeas courts have routinely found the failure constitutionally deficient. *See Brown v. Myers*, 137 F.3d 1154, 1156-57 (9th Cir. 1998); *Hadley v. Groose*, 97 F.3d 1131, 1134-35 (8th Cir. 1996); *Griffin v. Warden*, 970 F.2d 1355, 1358-59 (4th Cir. 1992) (citing cases); *United States v. Gray*, 878 F.2d 702, 711 (3d Cir. 1989); *Montgomery v. Petersen*, 846 F.2d 407, 414 (7th Cir. 1988); *Code v. Montgomery*, 799 F.2d 1481, 1483 (11th Cir. 1986); *Nealy v. Cabana*, 764 F.2d 1173, 1178-80 (5th Cir. 1985). These courts have rested their decision on the common sense observation that "independent corroboration by a neutral, disinterested witness would perforce be

extremely significant." *Montgomery*, 846 F.2d at 414; *see also Hadley*, 97 F.3d at 1135 (given crucial nature of alibi witness, failure to investigate was deficient performance); *Workman v. Tate*, 957 F.2d 1339, 1345 (6th Cir. 1992) (failure to investigate and interview promising witnesses is negligence rather than trial strategy). Accordingly, Mr. Foster has clearly met the requisite showing that his counsel's conduct fell below an objective standard of reasonableness.

Despite the overwhelming case law recognizing the value of a corroborating disinterested alibi witness, the majority here nonetheless holds that Mr. Foster was not prejudiced by his counsel's ineffective performance, characterizing the absent testimony as "cumulative" and "insufficient". The cases discussed below have pointedly rejected such arguments when made by the prosecution. I find their analysis compelling and their conclusion inescapable.

In articulating the appropriate test for assessing whether counsel's deficient performance prejudiced a defendant's defense, the Supreme Court has stated that "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). The Court defined "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." *Id.* In so doing, the Court rejected an outcome-determinative standard as inappropriate and imposing too heavy a burden on

defendants, pointing out that "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id.* at 694. Thus the question for our consideration is "whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." *Id.* at 695. The Supreme Court has defined "reasonable doubt" as "a doubt that would cause a reasonable person to hesitate to act." *Victor v. Nebraska*, 511 U.S. 1, 20 (1994).

The trial here was in essence a swearing match between Mr. Foster and his wife.[2] Mrs. Foster testified that she saw Mr. Foster commit the crime and that he did so out of jealousy. Mr. Foster denied being present when the crime was committed and testified that he was instead at Weddles grocery store after being sent there by his wife.

In my view the majority is simply wrong in characterizing the circumstantial evidence against Mr. Foster as "strong." Although the method by

---

[2] One of Mr. Foster's former cell mates, Mr. Jody Lynch, testified *only* at the sentencing stage of the trial that Mr. Foster had admitted killing Mr. Wiley. Because this evidence was not presented at the guilt phase of the trial, it cannot be a factor in assessing the prejudice prong of the *Strickland* inquiry. Mr. Lynch apparently made a practice of trading his testimony for lenient treatment since the sentencing record indicates he was also testifying in yet another proceeding about another jailhouse confession he allegedly happened to overhear. The doubtful value of this testimony is underscored by the fact that the state chose not to present it at the guilt stage.

which the murder was committed and the state of the crime scene indicated that force was used, Mrs. Foster herself was not a small woman. The record shows that she was five feet six inches tall and admitted to weighing more than her husband. This evidence would have allowed the jury to find that she committed the crime herself.[3] Moreover, while the jury could also have concluded from the evidence that Mrs. Foster did not act alone, if Mr. Foster had established an alibi the jury could have believed that she acted together with someone other than her husband. The fact that Mrs. Foster's testimony on the manner of the victim's death was consistent with the rest of the prosecution's evidence tends to prove only that she did the crime or saw it done, it says nothing about the identity of her accomplice, if any. Finally, Mr. Foster's flight from the police in Fort Worth is hardly compelling evidence of his guilt. Mr. Foster, who was identified in elementary school as mentally retarded, *see* Application for Post Conviction Relief, attach. 4, testified that after he obeyed police orders to stand at the back of the car, the police drew a pistol on him. Mr. Foster said that because he did not know whether the police were going to shoot, he fell backward into a ditch and ran. He further testified that he was scared, and that because of his previous encounters with the Fort Worth police, they had a habit of stopping him. Thus,

---

[3] A note in Mrs. Foster's handwriting was discovered on the door of the house the day after the crime saying that the couple would be back soon.

contrary to the majority's assertion, the prejudice arising from the missing alibi witness must be assessed in light of the fact that the case rested virtually entirely on the credibility of Mrs. Foster, as the prosecutor admitted in closing.

The trial record contains testimony from neighbors of the Fosters who testified that the victim arrived at the Foster residence between 6:45 and 7:00 p.m. on the day of the crime, and that his vehicle was gone by 7:15 p.m. Ms. Fuller, the missing alibi witness, stated by affidavit that she remembered Mr. Foster as a regular customer and provided many specific details in support of her identification. She stated that he and a heavy-set black woman entered the store late in the afternoon and left when the store could not cash their welfare check. She stated the Mr. Foster returned to the store alone later that evening at between 6:00 and 7:00 p.m. She checked him out and remembered him buying diapers, lettuce, and tomatoes. She gave him an extra paper sack for his head because it was raining outside, and told him he could wait outside the store until the rain stopped. She stated that he was in the store approximately forty-five minutes and was picked up in front of the store by a vehicle later identified as belonging to the victim. Her statements support Mr. Foster's trial testimony and, if believed by the jury, cast grave doubt on Mrs. Foster's testimony that he committed the crime.[4]

---

[4] Although the majority asserts Ms. Fuller's testimony would be subject to "intense cross-examination" on the ground that it concerned events ten years before, had defense counsel properly investigated and presented the alibi

The trial evidence showed that the murder occurred between 6:45 and 7:15 p.m. Ms. Fuller's testimony that Mr. Foster was picked up in the victim's vehicle would have established that the murder occurred before Mr. Foster was picked up, and her testimony that he arrived at the store between 6:00 and 7:00 p.m. would have made it nearly impossible for him to have killed the victim at his home between 6:45 and 7:15 p.m.

Numerous cases addressing counsel's failure to investigate and present testimony from a disinterested alibi witness under these circumstances have held that counsel was ineffective and that the defendant was prejudiced thereby. In *Brown*, 137 F.3d 1154, for example, the court pointed out that the missing alibi witnesses "would have altered significantly the evidentiary posture of the case," and that the defendant's "own testimony would have appeared more credible because it coincided in important respects with those of his alibi witnesses." *Id.* at 1157. The court emphasized that because testimony from an alibi witness which is consistent with that of the defendant would buttress the defendant on a

---

testimony of Ms. Fuller at the trial in November 1983, she would have been describing events that occurred in April 1983, only seven months earlier. Ms. Fuller's recollections, even at this late date, are remarkably specific. Moreover, the fact that her testimony would be subject to challenge on retrial on the basis of its age is utterly irrelevant to assessing whether Mr. Foster was prejudiced by her failure to testify in 1983. Because there was no evidentiary hearing on the issue of prejudice, no court has assessed either Ms. Fuller's recollection or her credibility.

-7-

crucial point, "it creates a reasonable probability that the fact-finder would have entertained a reasonable doubt concerning guilt." *Id.* at 1158. The court further stated that "without any corroborating witnesses, [the defendant's] bare testimony left him without any effective defense." *Id.*

In *Montgomery*, 846 F.2d 407, the court considered a trial that, as here, boiled down to a swearing match between the state's witness incriminating the defendant and the defendant denying any involvement. As the court pointed out, "[t]he jury was presented with a straightforward credibility choice" in which "independent corroboration by a neutral, disinterested witness would perforce be extremely significant." *Id.* at 414. The court held that when the testimony of a missing witness would have been exculpatory, it would be "significant to the petitioner's defense in several respects." *Id.* at 415. First, it contradicted the state's chief witness and thus "had a direct bearing on this witness' veracity, a witness upon whose testimony the state depended in order to secure a conviction." *Id.* Even more important, the court said, the missing testimony would have provided the petitioner with an unbiased alibi defense. *Id.* "As such, it did not merely raise doubts about the petitioner's guilt; if believed by the jury, it would have directly exonerated him of the crime." *Id.* Accordingly, the court held that it is unrealistic to look at the missing witness testimony as "'simply cumulative.'" *Id.*

In *Code*, 799 F.2d 1481, the court was presented with an attorney's failure to investigate an alibi defense in a trial that was a swearing match, and concluded that the failure effectively deprived the defendant of any defense whatsoever. *Id.* at 1484. The court granted habeas relief, stating that it could not confidently say that "the case against [the petitioner] could have withstood the introduction of the alibi testimony readily discoverable at the time of trial and subsequently proffered in habeas corpus proceedings." *Id.*

Likewise, in *Nealy*, 764 F.2d 1173, the court held that because the trial at issue was effectively a swearing match, "and because the missing testimony might have affected the jury's appraisal of the truthfulness of the state's witness and its evaluation of the relative credibility of the conflicting witnesses, [the petitioner] has stated a claim for ineffective assistance of counsel." *Id.* 1174. In so doing, the court pointed out that the missing testimony would have supported the defendant's credibility and diminished that of the state's witness, and that credibility was of major importance because the state's case could not be established if its witness was discredited. *Id.* at 1179.

Even in cases in which the trial involved evidence beyond a swearing match, courts regularly hold that counsel's failure to discover and present a witness whose testimony would have bolstered the defense on a crucial point prejudiced the defendant's right to a fair trial. *See, e.g.*, *Hadley*, 97 F.3d at 1136

(failure to investigate and present alibi defense resulted in prejudice as defined in *Strickland*); *Griffin*, 970 F.2d at 1358-59 (counsel's failure to present evidence of alibi witness to refute eyewitness identification undermined confidence in outcome of trial); *Workman*, 957 F.2d at 1346 (failure to procure testimony of witnesses who would have supported defendant's version of events created reasonable probability that outcome would have been different); *Grooms v. Solem*, 923 F.2d 88, 90-91 (8th Cir. 1991) (prejudice shown where missing alibi testimony would have supported alibi defense and raised reasonable doubt about veracity and credibility of state's witness); *Chambers v. Armontrout*, 907 F.2d 825, 832 (8th Cir. 1990) (failure to present disinterested witness who would have supported defendant's claim of self-defense undermined confidence in outcome of trial); *Gray*, 878 F.2d at 712-14 (failure to present witness was prejudicial when evidence would have been significant on credibility issue and would have corroborated defense version of case); *see also Lawrence v. Armontrout*, 900 F.2d 127, 130 (8th Cir. 1990) (to affirmatively prove prejudice, a petitioner ordinarily must show that testimony of uncalled witness would have been favorable and that witness would have testified at trial).

As the majority recognizes, the assessment of prejudice is a fact-bound inquiry. *See* maj. op. at 11 n.1. Nonetheless, in support of its holding that counsel's failure to present a disinterested alibi witness did not prejudice Mr.

-10-

Foster's defense, the majority cites three cases which are so factually distinguishable as to shed no light on the inquiry here. A detailed examination of these cases reveals that they concern circumstances far different from those before us.

The majority cites *Lawrence v. Armontrout*, 31 F.3d 662 (8th Cir. 1994), for the proposition that prejudice is not always established whenever a missing witness would have testified to a fact that would be inconsistent with the defendant's guilt. In so concluding, the court in *Lawrence* rejected the proposition that habeas relief is required "in such instances regardless of the strength of the evidence supporting the petitioner's conviction." *Id.* at 667. Significantly, the court made this statement, with which I have no quarrel, after the case had been remanded for an evidentiary hearing to determine whether the petitioner could show prejudice. Three of the witnesses who testified at that hearing offered testimony relevant to the petitioner's alibi defense that either was not specific to the night in question, or provided no details of the evening, or did not rule out the possibility that the petitioner committed the crimes. *Id.* at 668. The court held that although this evidence might justify relief if the state's case were relatively weak, the evidence of guilt was substantial. The court noted that three different witnesses identified the petitioner as being at the scene of the crime, one of whom saw him from only five feet away and another of whom

-11-

memorized the license number of the car used in the crime that was later traced to the petitioner's mother. In the case before us, of course, the state presented no such evidence from disinterested witnesses.

The majority also cites *Kubat v. Thieret*, 867 F.2d 351 (7th Cir. 1989). In that case, the court found no prejudice from counsel's failure to present three alibi witnesses because the prosecution presented significant evidence to corroborate its accomplice witness. As in *Lawrence*, the court's holding was made after an evidentiary hearing, in which three witnesses not called at trial testified on behalf of the petitioner. The Seventh Circuit held that counsel had not been ineffective in failing to call two of the witnesses, and that the lack of the third witness, who was not strictly speaking an alibi witness, did not prejudice the petitioner. In so doing, the court weighed the testimony of this witness against that of five eyewitnesses who identified the petitioner as accompanying the confessed accomplice, one of whom had carried on a half-hour conversation with the petitioner, as well as numerous other witnesses who provided corroborating details. *Id.* at 362.

Finally, the majority cites another Seventh Circuit case, *United States v. Kleba*, 796 F.2d 947 (7th Cir. 1986), in which the court held that no prejudice arose from a missing alibi witness where the defendant would have had ample time to commit the crime if he had left the witness' apartment ten minutes earlier

than she stated in her affidavit. The defendant was convicted of attempted rape and robbery. Over a dissent, the court concluded that the defendant was not prejudiced by the lack of the alibi witness, relying on testimony from police officers that they observed the attack, pursued the attacker, apprehended the defendant without ever losing sight of him, and found the victim's watch in his pocket after his arrest. *Id.* at 956-57.

The result reached by the Seventh Circuit in both *Kubat* and *Kleba* is to be contrasted with the result it reached in *Montgomery*, 846 F.2d 407, discussed above, in which the court held that when the trial consists of a swearing match between the defendant and the state's witness, the failure to present a disinterested alibi witness prejudiced the defense. In fact, none of the cases relied on by the majority presented the scenario before us, a credibility contest between two witnesses in which the state's circumstantial evidence is slim. Here, as in the cases I discuss and which the majority does not address, the trial was a swearing match between two people, Mr. Foster and his wife. Indeed, in its closing argument the state prosecutor described Mr. Foster and his wife as the two most important witnesses, characterized Mr. Foster's testimony as "totally unbelievable," trial trans. at 537, and rested its case on the believability of Mrs. Foster, *id.* at 552, stating that if the jury had any doubts about who was telling the truth it should acquit, *id.*

I have discovered no case and the majority has cited none in which a court under these circumstances found no prejudice in the failure to present testimony from a disinterested corroborating alibi witness. The majority stands alone in this regard and in so doing does not even address the factually indistinguishable cases to the contrary. On the facts of this case and in light of the treatment other circuits have given in closely analogous circumstances, I do not see how we can hold that Mr. Foster has shown no prejudice because the missing witness' testimony would have been cumulative or would have had no impact on the jury's credibility determination. To the contrary, such testimony buttresses the credibility of the defendant and undermines that of the state's witness. It is in fact the cumulative nature of such testimony that makes it valuable and its lack prejudicial. I cannot square the majority's resolution of this issue with the many cases unanimously contrary to its position, or with the Supreme Court's admonition that "'[o]ur duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case.'" *Williamson*, 110 F.3d at 1514 (quoting *Burger v. Kemp*, 483 U.S. 776, 785 (1987)).

In my view, Mr. Foster is entitled to habeas corpus relief on his effective assistance of counsel claim. At the very minimum, the case should be remanded to the district court for an evidentiary hearing to further develop this issue. *See Lawrence*, 900 F.2d at 131 (remand "to hold an evidentiary hearing to determine

whether trial counsel's failure to investigate and call alibi witnesses prejudiced [petitioner's] defense.")

I respectfully dissent.[5]

---

[5] Because the basis of my dissent is my belief that Mr. Foster is entitled to habeas relief on his Sixth Amendment claim, I do not need to address the majority's treatment of the other issues raised by Mr. Foster on appeal.