**Melvin Derrick BROWN, Petitioner–Appellant,**

**v.**

**Edward Charles MYERS; Attorney General Of The State Of California, Respondents–Appellees.**

**No. 96–56118.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 4, 1997.

Decided March 6, 1998.

Callie A. Glanton, Federal Public Defender, Los Angeles, California, for petitioner–appellant.

Kenneth N. Sokoler, Deputy Attorney General, Los Angeles, California, for respondents–appellees.

Before: CANBY, and THOMPSON, Circuit Judges and MOLLOY,* District Judge.

CANBY, Circuit Judge:

Melvin Derrick Brown appeals the district court's dismissal of his petition for writ of habeas corpus, brought pursuant to 28 U.S.C. § 2254. Brown argues that he was prejudiced by ineffective assistance of counsel during his trial in California state court for attempted murder. The district court concluded that Brown's counsel was ineffective, but that the harm was not prejudicial. We review de novo, *Dyer v. Calderon*, 122 F.3d 720, 732 (9th Cir.1997), and conclude that the harm to Brown was prejudicial. Accordingly, we reverse and remand to the district court with instructions to issue the writ, unless California retries the defendant within a reasonable period of time.

---

\* The Honorable Donald W. Molloy, District Judge for Montana, sitting by designation.

**1.** Gregory and Melvin are not related. There are several other persons named Brown in this case.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1987, petitioner Melvin Brown and Gregory Brown quarreled outside of Gregory's residence.[1] Gregory hit Melvin in the mouth. Gregory's brother Andre and sister Tasha witnessed the fight. After being hit, Melvin drove away, but returned to the area 10 to 25 minutes later, with his brother (and codefendant) Mitchell. Melvin and Gregory fought again on a street near Gregory's house, for two to five minutes, while Gregory's family looked on. Melvin hit Gregory in the mouth, and Gregory then choked Melvin and threw him to the ground. Melvin then got up. Gregory and his brother Andre testified that Melvin said to Gregory "you're dead." Gregory's sister Tasha testified that Melvin said "I'll be back." Gregory's girlfriend Tammy Highsmith, also present, testified that she did not hear Melvin say anything. Melvin then drove away.

Gregory returned to his house and prepared to leave. He went out to his father's car, heard shots, and ran back toward the house. Inside, he learned he had been shot in the thigh. He was taken to the hospital, treated, and released. Descriptions of the assailant varied. Tammy Highsmith testified that she looked out of Gregory's house after the shots were fired and saw Melvin running away. Highsmith's testimony was that the shots were fired about 20 minutes after the second fight ended, placing the shooting at about 6:20 p.m. Gregory testified that as he ran back to the house, he saw the shooter running into the alley; he did not observe the shooter's face, but saw that he was wearing a blue sweatshirt and dark blue or black corduroy pants. Melvin had been wearing a dark blue sweatshirt and dark pants during the earlier fights. Gregory did not, however, identify Melvin as the shooter when interviewed by a policeman at the scene; he told the officer that the shooter's weapon was a black revolver.

Gregory's brother Andre testified that he was riding his bicycle through the alley when

---

To avoid confusion, we will refer to persons by their first name if Brown is their surname.

he heard shots; he then saw Melvin running through the alley holding a gun, which appeared to be a chrome .45. Melvin got into a car driven by Mitchell, which went a short distance and let him out. Melvin then got into another car driven by one Jasper Deeds, and departed. Andre did not tell the police officer about the second car.

Gregory's sister Tasha testified that she saw Melvin shooting at Gregory with a long black gun. She did not talk to the officer at the scene.

Melvin testified at trial. He stated that, at the end of the second fight, he said nothing but simply left the scene. He had no gun. He went to the house of his girlfriend, Senta Saunders. He arrived between 5:45 and 6:00 p.m., when it was still light. He telephoned home and spoke with his sister, Carmen. Two friends of Cynthia's came over and the group went to the house of one of the friends and watched television until about 8:00 p.m.

Although Melvin insisted throughout that he was with friends at the time of the shooting, his attorney did not investigate Melvin's alibi claim or present any alibi witnesses to corroborate Melvin's testimony. He also made no effort to contact one Clinton Walker, a neighbor of Gregory's; Andre had stated at the preliminary hearing that he had seen Walker at the alley when Melvin ran through it.

Melvin's attorney defended Melvin by arguing the potential for bias among the prosecution's witnesses. He also explained to the jury during his closing argument that photographs of the crime scene showed bullet holes in a car and a tree. The bullet holes were positioned so that the shooter must have been down the street from Gregory. All four prosecution witnesses, however, placed the shooter across the street from Gregory.[2]

The prosecution in its closing argument emphasized the lack of corroboration for Melvin's testimony:

How many people have we got? Six or seven? He went to another house to watch some select TV for a while. Where are these people in this case to testify? Maybe they don't [sic] to come in and be untruthful to you. Okay?

I can assure you the court through its powers has ways to bring in witnesses. There are subpoenas in these cases. They're free. They come in long sheets and you tear them off and you give them to witnesses so they have to show up. They have to come to court. Okay? He has no witnesses because that is not what he did.

Later in his argument, the prosecutor stated on at least two more occasions that the defendant's testimony was unsupported because witnesses did not appear to testify and corroborate it.

The jury convicted Melvin. The California Court of Appeal affirmed, and the California Supreme Court denied review. The state courts also denied post-conviction relief.

In 1990, Melvin filed a federal habeas petition alleging ineffective assistance of counsel. The district court denied the petition on the ground that it made only conclusory allegations. We reversed and remanded with instructions for the district court to determine whether Melvin's representation had been constitutionally deficient. Accordingly, about six years after Melvin's trial, the district court conducted an evidentiary hearing to consider the testimony of the witnesses who would have appeared on Melvin's behalf, as well as to hear testimony about why Melvin's attorney never contacted those witnesses. The district court concluded that the quality of Melvin's representation had been below an objective standard of reasonableness. Nevertheless, the court dismissed the habeas petition on the ground that the jury would have convicted Melvin anyway. Melvin now appeals that determination.

## ANALYSIS

■ There is no dispute on this appeal that Melvin's attorney failed to meet the professional standard required for effective

---

**2.** The prosecutor spent little time during his rebuttal addressing the import of the photographs. He did not say that defense counsel misinterpreted the photographs. He simply retorted that if the shooter really had been down the street, then witnesses would have come forward to say so.

assistance of counsel under the Sixth Amendment. The State does not argue to the contrary. The only question is whether there is a reasonable probability that counsel's failure to investigate, and to locate and produce witnesses, affected the outcome of the proceeding. Melvin, however, does not have to show by a preponderance of the evidence that the result in his case would have been different but for counsel's errors. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984). The testimony at the evidentiary hearing held by the district court leads us to conclude that counsel's errors undermine confidence in the outcome of Melvin's trial.

Senta Saunders testified that, on the night of the shooting, she was fixing her hair between 5:00 and 6:00 p.m. Melvin came to see her. She did not remember exactly when he arrived, but it was still light outside.

Carmen Brown, Melvin's sister, testified that he telephoned her on that day. She was not sure of the time, but placed it "about early afternoon."

Lachonda Haliburton testified that she saw Melvin at Senta Saunders' house in the late afternoon of the day in question. She was not sure of the exact time. After she saw him at Saunders' house, they all walked about three blocks to Ms. Haliburton's sister's house. They watched television and ate there for about two hours.

Clinton Walker testified that he knew Melvin and could recognize him if he saw him. On the day Gregory was shot, Walker was in the alley nearby. After he heard the shots, he saw someone jump the gate and run south down the alley and west toward Pasadena Street. The person was about six feet tall, with an Afro hair style. It was not Melvin (Melvin is about 5 feet, 8 inches tall and wore a Jeri–Curl hairstyle).[3]

All of these witnesses testified that they had not been contacted by defense counsel, and would have testified at trial if asked.

The missing testimony of the alibi witnesses would have altered significantly the evidentiary posture of the case. Certainly those witnesses tend to support Melvin's version of his actions after the second fight. Had the additional witnesses appeared, the jury would have had to balance more evenly divided evidence to reach its verdict. Melvin's own testimony would have appeared more credible because it coincided in important respects with those of his alibi witnesses. The prosecutor would have been unable to attack Melvin's testimony on the ground that it was uncorroborated. It is not certain, of course, that the jury would have chosen to believe Melvin and his witnesses and discredit the prosecution witnesses, but there were sufficient inconsistencies in the prosecution evidence to make that result sufficiently probable to undermine confidence in the outcome of the trial. The prosecution witnesses were family members who had witnessed one or both of the earlier fights, there were some inconsistencies in their testimony and in their first reports to the police, and their account of events appeared to be inconsistent with photographs showing where the bullets had hit.

The district court concluded that the alibi witnesses would not have helped Melvin at trial because their testimony during the evidentiary hearing was vague with regard to time. Their testimony, however, was consistent with Melvin's account that he arrived at

---

**3.** The State argues that Walker's testimony may not be considered because it was not presented to the state courts. In state post-conviction proceedings, Melvin argued that Elliott had been ineffective because he failed to secure the testimony of alibi witnesses. Before the district court, Melvin asserted that his attorney had failed as well to secure the testimony of Walker, a percipient witness.

It is an arguable question whether we may consider Walker's testimony. Federal-state comity favors the principle that federal courts should not "entertain new evidence that places [a] claim in a significantly different posture, when that evidence was never presented to the state courts." *Nevius v. Sumner,* 852 F.2d 463, 470 (9th Cir.1988); *see also Granberry v. Greer,* 481 U.S. 129, 134, 107 S.Ct. 1671, 1675, 95 L.Ed.2d 119 (1987). However, the gravamen of Melvin's claim—that he was harmed at trial because his attorney failed to locate witnesses in his defense—is the same now as it was before the state courts. We need not resolve this question, however, because we conclude that the absence of the alibi witnesses alone undermines confidence in the outcome of Melvin's trial.

Saunders' house too early to have participated in the shooting. Because their testimony buttressed Melvin's account on this crucial point, it creates a reasonable probability that the fact-finder would have entertained a reasonable doubt concerning guilt. *See Nealy v. Cabana,* 764 F.2d 1173, 1178–79 (5th Cir. 1985); *United States v. Gray,* 878 F.2d 702, 713–14 (3d Cir.1989). As it was, without any corroborating witnesses, Melvin's bare testimony left him without any effective defense. *See Code v. Montgomery,* 799 F.2d 1481, 1484 (11th Cir.1986).

Focusing, as we must, "on the fundamental fairness of the proceeding whose result is being challenged," *Strickland,* 466 U.S. at 696, 104 S.Ct. at 2069, we conclude that the ineffective assistance of Melvin's counsel prejudiced him to the extent that it undermines confidence in the outcome of his trial. *Id.* at 694, 104 S.Ct. at 2068. Accordingly, we reverse the judgment of the district court and remand with instructions to issue a writ of habeas corpus, unless California decides to retry Melvin within a reasonable time.

**REVERSED AND REMANDED WITH INSTRUCTIONS.**