# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

YUN HSENG LIAO,
    *Petitioner-Appellant*,

v.

MAURICE JUNIOUS,
    *Respondent-Appellee*.

No. 14-55897

D.C. No.
2:10-cv-05691-JGB-JCG

ORDER AND
OPINION

Appeal from the United States District Court
for the Central District of California
Jesus G. Bernal, District Judge, Presiding

Argued and Submitted
October 23, 2015—Pasadena, California

Filed April 1, 2016

Before: Harry Pregerson and Stephen S. Trott, Circuit
Judges and William H. Stafford,[*] Senior District Judge.

Order;
Opinion by Judge Trott

---

 [*] The Honorable William H. Stafford, Jr., Senior District Judge for the
U.S. District Court for the Northern District of Florida, sitting by
designation.

## SUMMARY[**]

### Habeas Corpus

The panel (1) withdrew its opinion filed January 29, 2016; (2) filed a new opinion reversing the district court's denial of California state prisoner Yun Hseng Liao's habeas corpus petition challenging his conviction for assaulting and attempting with premeditation to kill his ex-girlfriend's teenage son, and remanding; and (3) dismissed as moot the warden's petition for rehearing en banc.

Liao's unsuccessful defense was that the incident happened while he was in a state of unconsciousness during an episode of sleepwalking, and thus, that he lacked the intent required for the crimes with which he was charged.

During further proceedings on Liao's ineffective assistance claim after newly discovered evidence revealed a significant lapse on trial counsel's part, the Superior Court concluded that trial counsel's performance had been constitutionally defective by failing to secure medical evidence to support Liao's primary expert's sleepwalking opinion, but that counsel's failure had not been prejudicial.

The panel concluded (1) that the Superior Court's decision that Liao suffered no prejudice was based on an unreasonable determination of the facts and was objectively unreasonable in its application of clearly established Federal

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

constitutional law; and (2) that his conviction was an extreme malfunction of justice.

## COUNSEL

Dennis A. Fischer (argued) and John M. Bishop, Law office of Dennis A. Fischer, Santa Monica, California, for Petitioner-Appellant.

Ryan M. Smith (argued), Deputy Attorney General, Kamala D. Harris, Attorney General of California, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, and Kenneth C. Bryne, Supervising Deputy Attorney General, Los Angeles, California, for Respondent-Appellee.

## ORDER

The Opinion filed January 29, 2016, is withdrawn. It may not be cited as precedent by or to this court or any district court of the Ninth Circuit.

The attached Opinion is filed simultaneously with this Order.

Appellee Junious's pending petition for rehearing en banc is **dismissed** as moot.

SO ORDERED.

# OPINION

TROTT, Senior Circuit Judge:

On June 16, 2003, a jury in the Superior Court of Los Angeles County, California convicted appellant Yun Liao of assaulting and attempting with premeditation to kill Henry Chen, his ex-girlfriend Li's teenage son. Liao admittedly hit Chen three times on the head with a hammer at 4:00 a.m while Chen was asleep. Liao's unsuccessful defense was that the incident happened while he was in a state of unconsciousness during an episode of sleepwalking, and thus, that he lacked the intent required for the crimes with which he was charged. The court sentenced him to life in prison with the possibility of parole, plus four years. Twelve years later, he has served his time and is out of prison on parole.

Liao's appeal as well as his pursuit of state habeas corpus relief failed, but because of newly discovered evidence revealing a significant lapse on his trial counsel's part, the California Court of Appeal returned his case to the Superior Court for further proceedings on his claim of ineffectiveness of counsel. The Court of Appeal ordered the California Department of Corrections and Rehabilitation to show cause why Liao's conviction should not be set aside. After a hearing, the Superior Court concluded in a decision spoken from the bench that trial counsel's performance had indeed been constitutionally defective by failing to secure medical evidence to support his primary expert's sleepwalking opinion – a conclusion with which the prosecution agreed. The Superior Court found, however, that counsel's failure had not been prejudicial.

After unsuccessful attempts in state court to overturn the Superior Court's decision, Liao filed a petition for a writ of habeas corpus in the Central District of California, alleging a violation of his Sixth Amendment right to effective assistance of counsel. In an order accepting the report and recommendation of a magistrate judge agreeing with the Superior Court, the district court denied Liao's petition. He appeals.

We have jurisdiction over this timely appeal pursuant to 28 U.S.C. §§ 1291 and 2253. Because we conclude (1) that the Superior Court's decision was based on an unreasonable determination of the facts and objectively unreasonable in its application of clearly established Federal constitutional law, and (2) that his conviction was an extreme malfunction of justice, we reverse.

# I

## Facts[1]

At about 4:00 a.m. on August 4, 2002, Henry Chen was awakened by the sensation of three blows on his head. They were inflicted by a household hammer, which Chen had left on the floor of his room. He covered his head with his hands, and in the dark sought his assailant, whom he pushed to the ground. Chen then saw that it was Liao, and he asked Liao what he was doing. Liao did not reply. Chen ran into his mother Li's room, passing his younger brother Danny, and telling her Liao had hit him. She covered his head, and asked

---

[1] We borrow these facts without attribution from the California Court of Appeal's unpublished decision. *People v. Yun Hseng Liao*, Second Appellate District, No. B170596.

Liao to call the police.  He stated he would go to jail, but after several requests, he made the call.  Li asked Liao why he hit Chen.  After repeatedly saying, "Why did I do it?"  Liao replied that he had been dreaming someone was hitting him, and he had fought back.

As Chen walked outside to meet arriving paramedics, Liao told him to say he had fallen down the stairs, because otherwise he would go to jail.

Chen suffered three scalp lacerations, each over an inch long, which were closed by staples, as well as a cut to his ear. He also suffered a concussion, and both of his hands were fractured.  He remained at the hospital for about six hours. The attending physician opined that Chen had received a series of glancing but direct blows to the head.  There was no skull or brain damage.  At the time of trial, Chen still experienced headaches and dizziness, as well as some pain in his hands.

Chen had known Liao for five years, during which time Liao had been Li's boyfriend, and had lived with her and her sons for four years.  In that time, Liao had never previously struck Chen, although, according [to] Chen, he had hit Danny once, and Li twice (out of Chen's presence).  Liao had shown no animosity toward Chen, who believed Liao had attacked him out of anger at Li.

On the night of the incident, Chen testified that Liao and Li had had an argument in her room.  Li then stopped a fight between the brothers, and Liao told Chen not to make Li angry.  Before Chen went to bed around midnight, he saw Liao, smoking a cigarette and staring out the sliding window by the balcony.  Chen testified that Liao smoked when he was

"stressed." Danny went to sleep on the living room couch. When awakened by the blows, Chen, who had been sleeping face down, threw Liao off, and then saw him. Liao seemed shocked, and stared at Chen, mouth open. Liao was holding the hammer, raised, while leaning against a wall about seven feet from Chen. Chen then asked Liao what he was doing, and received no reply.

Danny had gone to sleep about 9:00 p.m. He was awakened by the sound of three blows, like a hammer striking a nail. He saw his brother bleeding profusely. Li asked Liao to call the police. The first time he refused, saying that if he went to jail this time it would cost him a lot of money to get out. After a second request he did call, and he accompanied Li to the hospital.

## II

## A.

### Counsel's Error

In preparation for Liao's trial, his counsel hired Dr. Clete Kushida, a Director of the Stanford University Center for Human Research and a board certified physician at Stanford's Sleep Disorders Clinic. Dr. Kushida is also on the academic faculty of the Stanford School of Medicine. After reviewing the facts and circumstances of Liao's unusual pre-dawn behavior, Dr. Kushida recommended that Liao undergo a medical examination and a "sleep study," formally known as polysomnogram.

Dr. Kushida put his recommendations in a letter dated April 8, 2003. In the letter, Dr. Kushida said that "further

evaluation of Mr. Liao is warranted, with a consideration of a sleepwalking diagnosis." The inquiry would include "[a]n evaluation conducted by a sleep specialist. This would entail a review of Mr. Liao's medical history and a physical evaluation." Dr. Kushida also recommended "[a]n overnight polysomnogram (sleep study) conducted by an experienced polysomnographic technologist, and reviewed by a sleep specialist . . . an important component of the evaluation of an individual with a diagnosis of sleepwalking."

Because Liao was in custody, counsel filed a request with the Superior Court for authorization to conduct the procedures recommended by Dr. Kushida. On April 10, 2003, a court commissioner – not the trial judge – denied the motion without prejudice. On April 25, 2003 counsel promptly renewed his motion, supplementing it with a second letter from Dr. Kushida dated April 22, 2003, reiterating the necessity of a sleep study. We will discuss the content of this second letter in more detail in part I B. of this opinion. The commissioner took the matter under submission. When counsel's associate later called the court to inquire about the status of the request, a court clerk erroneously told him that the motion had been denied when in fact it had been granted on May 1, 2003. On the commissioner's Order, he wrote, "1. To be completed prior to trial date – 2. Not to exceed $2500," followed by his signature. The approving Order, prepared by counsel and signed by the court commissioner, lay undiscovered in the court's file until Liao's conviction was on appeal.

Instead of conducting any further inquiry into the status of his motion, counsel proceeded to trial without the benefit of the medical examination and study for which Dr. Kushida

had asked. During the trial, the absence of a sleep study turned out to be the Achilles heel of Liao's defense.

At all stages of the proceedings, California has conceded that counsel's failure to verify what the court clerk told his associate over the phone amounted to constitutionally ineffective assistance under *Strickland v. Washington*, 466 U.S. 668 (1984).

## B.

### The Effect at Liao's Trial
### of the Absence of a Sleep Study

The heart of Liao's defense was lack of intent caused by a sleep disorder. The Superior Court correctly articulated the importance of this issue, saying,

> The evidence in this case centered upon the issue of consciousness. If Mr. Liao was, in fact, in an unconscious state, under the law, he would not be responsible for his act. An unconsciousness would preclude an express malice or the intent to kill. It would preclude deliberation and premeditation because, obviously, one cannot formulate an intent to kill or deliberate or premeditated [sic] in an unconscious state.

To establish Liao's sleepwalking / lack of criminal intent defense, counsel called Dr. Kushida as an expert witness. When Dr. Kushida took the stand however, he did not have any of the material referenced in his letter to rely on or to support his opinion. He testified that because he did not have

what he had asked for, a sleep study and physical examination, he could not diagnose Liao as a sleepwalker, only render an opinion that he suffered from that condition.

The absence of this information enabled the prosecutor on cross-examination to discredit Dr. Kushida's testimony and to render his opinion suspect. The prosecutor's first question was whether Dr. Kushida had interviewed the defendant. His answer was no. The second question was whether he had "conducted any sleep studies of the defendant," to which Dr. Kushida gave the same negative answer. The third question was a statement: "So your opinion is based on – well, obviously your opinion is not based on anything that the defendant has told you or anything that you have observed in studying his sleep patterns, correct?" Answer, "That is correct."

Over and over the prosecutor returned to the absence of a sleep study and physical examination to support Dr. Kushida's testimony—an absence caused by counsel's error. On re-cross, she effectively bludgeoned Dr. Kushida with his second pre-trial letter submitted to the court commissioner in support of counsel's motion, using his own words recommending an examination and a sleep study.

Q: The Prosecutor          A: Dr. Kushida

Q Doctor, directing your attention to your letter to Mr. Donoghue, or his associate, dated April the 22nd. I think you have a copy in your hand?

A Yes, I do.

Q Do you state in that letter that sleepwalking is suspected in Mr. Liao's case because of the following?

A Yes, I do.

Q Okay. Do you also state in that letter that the above points raise clinical suspicion that Mr. Liao's behavior during the episode in question is compatible with sleepwalking?

A Yes.

Q Okay. Do you also say in that letter that further evaluation is warranted?

A Yes.

Q Do you continue to explain, specifically on page 2 of your letter that an overnight polysonogram [sic], a sleep study, is warranted to further evaluate Mr. Liao's preliminary sleepwalking diagnosis?

A Yes.

Q And then do you give the rationale for a sleep study in Mr. Liao's case?

A Yes, I do.

Q And there are three different rationales, correct?

A   Yes.

Q   You also state that it's – a sleep study is an objective test that is used to assess patients with sleep disorders, correct?

A   Yes, I do.

Q   And the last sentence you say that in the case of Mr. Liao the sleep study is an important component in his evaluation for a diagnosis of sleepwalking, correct?

A   That is correct.

. . . .

Q   During my cross-examination did you say that – did you testify that you could not conclude that the defendant was a sleepwalker, just that he may be a sleepwalker?

A   What I said was I could not make an official diagnosis because official diagnosis depends on actually clinically examining the patient.

Q   But you said that it was your opinion that he may be a sleepwalker?

A   Yes.

Q   Okay.  But – and it was also your opinion that you needed to do a sleep study because it was important to the diagnosis of him being a sleepwalker, correct?

A   At that time, yes.

. . . .

Q   Well, then why did you want to do a sleep study as you stated in you letter and as I thought you stated this morning?

A   To rule out other potential causes that – the main reason is that there are things that can mimic sleepwalking and that is nocturnal seizures or epilepsy.  That's the first point. And that can really be confused with sleepwalking and that's easily treated by putting the person on anticonvulsants.  That's the first point.

The second point is looking at markers on the sleep study because there are some elements on the sleep study that you can find that are non specific markers, you know, that indicate that the person might have sleepwalking.  The third reason is to rule out other sleep disorders such as sleep apnea or periodic limb movements that can fragment the sleep and trigger off a sleepwalking episode.  So that's the reason.  It's more to look at the etiology of the condition, the cause of the condition.

. . . .

Q   And now you are saying that your opinion is that he is a sleepwalker, correct?

A   Correct.

Q   That indicates to me that there has been a change in opinion since you have been on the witness stand from this morning.

A   I would have to go back, look at exactly what I said.  But it's my opinion that he is a sleepwalker.  At that time maybe perhaps I was thinking about the actual diagnosis.  And just to reiterate, to actually make a diagnosis, I would have to actually evaluate the patient. If you were to ask me what my opinion is, my opinion is he is a sleepwalker.

. . . .

The Court:   Doctor, tell us the difference between your opinion and a medical diagnosis.

The Witness:  Yes.  For medical diagnosis I would actually have to see the patient, and, you know, lay hands on the patient, physically examine the patient.  In terms of an opinion, it's based on material that I acquired about the patient to actually make my opinion regarding diagnosis.  But I can't actually say the word I diagnose this patient as having a condition

without actually talking with the patient.  But to clarify, you know, based on the material that I have received, you know, it is my opinion that he is a sleepwalker.  It's just that I can't actually say I diagnosed the patient as being a sleepwalker because I haven't actually physically evaluated the patient.

## C.

### Rebuttal

In rebuttal to Dr. Kushida's vulnerable opinion testimony, the prosecution called Dr. Kaushal Sharma, a physician board certified in psychiatry.  Dr. Sharma's expertise was in applying "knowledge and information about a suspected sleepwalker to the forensic issue."  He admitted he had "not run any sleep lab, therefore I would not call myself exclusively an expert in the field of sleepwalking."  The prosecution used Dr. Sharma to counter Dr. Kushida's opinion.  She did, using the absence of a sleep study as her weapon.

Q:  Prosecutor          A:  Dr. Sharma

A   I was given the task of looking over the documents you described and helping, initially, understanding a little bit more about the sleep disorders including sleepwalking. And I was given the task of looking at the report or letters of two of my professional colleagues and seeing if medically what they had described based on the information they had and whatever else they may have done

was the diagnosis consistent with the information they had, and to tell you if I agreed, in what aspect, and if I did not, in what aspect.

Q And did – in that process have you also formed your own opinion with regard to the defendant's mental status?

A Yes.

Q Let me just directly jump into whether or not you believe the defendant is a sleepwalker or has sleep disorders.

A Sleep disorders range from having difficulty falling asleep. He may have that problem in the jail. I don't know for a fact. But specifically about sleepwalking I believe the information given to me is insufficient to prove that he suffers from sleepwalking disorder.

Q And any information – well, why is that?

A Any confirmed diagnosis of somnambulism, s-o-m-n-a-b-u-l-i-s-m [sic], which is just the fancy term for sleepwalking, requires that the person be subjected to sleep lab tests where electrodes are placed on the person's brain and the brain's activity, as well as the activity of the eyes, because they move at a rapid pace in certain phases of the sleep, is detected. And then it's seen if the person is

doing activity which is inconsistent with the normal average sleep.

To the best of my knowledge the defendant in this case was not given any such sleep lab test. So that's the one problem I have and therefore I believe that there is insufficient data.

On cross-examination, Dr. Sharma stuck to his guns.

Q: Defense Attorney      A: Dr. Sharma

Q   Now your opinion there is insufficient information to determine a diagnosis whether or not the defendant suffered from sleepwalking. Is – what about as to an opinion, a medical opinion as compared to a medical diagnosis, is there a difference?

A   Well, diagnosis – well, in many ways they are. In the context, they are the same. Diagnosis is an opinion.

Q   Then are all opinions diagnoses?

A   No, they are not.

Q   So there is a difference?

A   Yes.

Q   So it's possible for a doctor to reach – to form an opinion without yet having a diagnosis, is that correct?

A   Sure.   A doctor may have opinion that there is no diagnosis.

Q   Is it your opinion that a – it's your opinion, I believe you testified, that a diagnosis requires that the person be subjected to a sleep lab test, correct?

A   In this context, yes.

### D.

### Jury Argument

Having set up her summation with the precision of a surgeon, the prosecutor belittled and mocked Dr. Kushida's testimony when she addressed the jurors in final argument.

(Prosecutor) Dr. Kushida's opinion, we have three different things with Dr. Kushida.   I couldn't believe the way he testified on the stand, frankly, ladies and gentlemen.  He says that in his letters to the defense attorney sleepwalking is suspected, you know, et cetera, et cetera.   This raises a clinical suspicion.   *But the sleep study is very important.   The sleep study is very important.*

Then when he comes to the stand and he testifies in court he starts out and he says,

yeah, the defendant may be a sleepwalker. But I mean [sic] need to do the sleep study in order to diagnose him or in order to say that he is a sleepwalker. This happened in direct examination, in my cross-examination. But when we come to the defendant's or the defense attorney's redirect examination, what does he say, he changes his testimony, right here in front of us, in front our eyes. He says the defendant is a sleepwalker. Oh, yeah, with medical certainty. That means a doctor's guarantee, a stamp of medical approval. How can you tell me that's not a diagnosis. He says with medical certainty. And sleep study is not required contrary to what he said. Then – and then let's look – so, you know, these are the doctors the defense is putting up and asking you to be convinced. That's unreasonable, ladies and gentlemen. These doctors have changed their testimony.

With regard to Dr. Sharma's opinion, Dr. Sharma is the only consistent doctor. His duty was to review Dr. Kushida's's [sic] opinions and letters, review Dr. Vicary's opinions and letters and his findings in that 8-page report, review the preliminary hearing transcript, the police reports, the evidence, so on so forth, and tell us whether or not he thought – whether or not he agreed with them. And that was a major risk on my part because he could have agreed with him. But you know what, it defies these two doctors, defies common sense. And Dr. Sharma told us that.

> He said there is insufficient evidence that the defendant is a sleepwalker. He was very – I think very professional about that. He could have said, you know, there is no evidence that the defendant is a sleepwalker or I don't think the defendant is a sleepwalker for X, Y, and Z reasons. *But he tells us there is insufficient evidence. Why? Because there was no sleep study that was done, which is important.*

(Emphasis added.)

### III

### The Sleep Study

On remand, the parties litigated in the Superior Court the effect of Liao's trial counsel's failure to secure an examination of his client and a sleep study. Before the evidentiary hearing, Liao finally received his sleep study, conducted in two phases by Dr. Milton Erman, a distinguished fellow of both the American Psychiatric Association and the American Academy of Sleep Medicine. Dr. Erman completed his psychiatric residency in Boston at Massachusetts General Hospital and a four-year fellowship at Harvard Medical School before going on to practice his specialty. In arriving at his diagnosis regarding Liao, Dr. Erman consulted an expert from Stanford, Dr. Guilleminault. Dr. Guilleminault is a world-renowned specialist in sleep disorders who has created a proprietary computer scoring technique called "power spectral analysis" which analyzes objective data obtained from a patient during sleep studies.

Based on the objective and subjective data collected during this detailed process, the doctors diagnosed Liao as a somnambulist, or a sleepwalker. They supported their collective opinion with their findings of sleep apnea, low sleep efficiency, stress and turmoil leading up to the event, E.E.G. results, a sleep hypnogram, significant nocturnal oxygen desaturations, and abrupt arousals from sleep caused by a lack of oxygen, all information Dr. Kushida did not have. Arousals from sleep result when the brain realizes that a person is not breathing. Sleep apnea arousals can produce sleepwalking. Dr. Erman's explanation was as follows:

> But let me clarify one of the things I am not sure we actually stated very clearly and that is the relationship between sleep apnea and the capacity to provoke arousal events that may lead to an episode of sleepwalking.
>
> When someone is experiencing a sleep apnea event, they are suffocating. The airway is closed off. The oxygen level is falling. The levels of carbon dioxide in the body are rising, and it is a stressor that typically will lead to something very much like a classic fight-or-flight response. So when the body recognizes the body and brain recognizes this event is going on after amorphizing a little bit, but the event is ended by an arousal. If we don't arouse, we die. And that's why people who are on sedative medications or alcohol may die from sleep apnea. This arousal is very much akin to somebody poking with a stick. This is the analogy I often use for patients which explains why people with sleep apnea

are so tired because awakening repetitively
during the night.

The sleep apnea event can be a trigger in
susceptible individuals for these episodes of
sleepwalking. So the relevancy here as well is
that not only would it contribute to the sleep
deprivation that would increase the risk of the
apnea – of the sleepwalking event, it could
also serve as the specific trigger that would
cause the sleepwalking event.

Dr. Erman also testified that Liao's behavior on the night
of the assault was consistent with not having been a "focused
assault that leads to injuries that might have been expected
had there been an intent to really seriously injure or kill, that
there was amnesia and confusion following the episode."

Dr. Erman was appropriately skeptical of Liao's
description of the events. To ensure that Liao was not
manufacturing a self-serving version of what happened on the
night in question, Dr. Erman gave him an occasion to do so,
but Liao stuck to his story:

(Dr. Erman)   I   actually   gave   him the
opportunity to embellish on the story because
to satisfy myself that this was an accurate
history that would be consistent with a non-
rem arousal disorder, I wanted to see whether
given the opportunity to embellish the report
to provide with more detail were there
monsters, were there dragons; and he didn't
provide that, which to me was consistent with
the history and also consistent with his giving

the truthful account and not really providing
me with more gory details even when I gave
him the opportunity and suggested perhaps
those might have been present.

## IV

## Standard of Review

Although we review de novo a district court's decision to grant or to deny a 28 U.S.C. § 2254 habeas petition, our review of a state court decision is quite deferential. In this respect, we accept and assiduously apply the Warden's statement of our demanding standard of review.

As amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254(d) constitutes a "threshold restriction," *Renico v. Lett*, 559 U.S. 766, 773 n.1 (2010), on federal habeas corpus relief as to state prisoners that "bars relitigation of any claim 'adjudicated on the merits' in state court" unless the claim meets one of the statute's two exceptions. *Harrington v. Richter*, 562 U.S. 86, 98 (2011). Under those exceptions, relief may be available if the state court decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* (quoting 28 U.S.C. § 2254(d)). Only if a petitioner can survive this threshold review as to claims previously rejected on their merits by a state court is a federal court permitted to reach the merits of a petitioner's claims, reviewing them de novo. *See Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) ("When a state court's adjudication of a claim is dependent

on an antecedent unreasonable application of federal law, the requirement set forth in § 2254(d)(1) is satisfied. A federal court must then resolve the claim without the deference AEDPA otherwise requires."); *see also Howard v. Clark*, 608 F.3d 563, 571–72 (9th Cir. 2010); *Frantz v. Hazey*, 533 F.3d 724, 735–36 (9th Cir. 2008) (en banc).

A state court decision is "contrary to" federal law only if it "applies a rule that contradicts the governing law" as set forth in Supreme Court opinions, or reaches a different decision from a Supreme Court opinion when confronted with materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). A state court engages in an "unreasonable application" of federal law if it identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies it to the facts of the prisoner's case. *Id.* at 413.

The inquiry under 28 U.S.C. § 2254(d)(1) is sharply circumscribed. First, "clearly established federal law" is limited to Supreme Court authority that "squarely addresses" the claim at issue and provides a "clear answer." *Wright v. Van Patten*, 552 U.S. 120, 125–26 (2008); *see also Lopez v. Smith*, 135 S. Ct. 1, 5–6 (2014) (per curiam) (grant of habeas relief reversed where court relied heavily on circuit decisions and the Supreme Court had failed to address the specific question presented by that case); *Marshall v. Rodgers*, 133 S. Ct. 1446, 1450–51 (2013) (federal habeas court may "look to circuit precedent to ascertain whether [a federal appellate court] has already held that the particular point in issue is clearly established by Supreme Court precedent," but may not use lower court authority "to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule" or "to determine whether a particular rule of law is so

widely accepted among the Federal Circuits that it would, if presented to [the Supreme] Court, be accepted as correct”); *Premo v. Moore*, 562 U.S. 115, 127–28 (2011); *Knowles v. Mirzayance*, 556 U.S. 111, 121–22 (2009); *Carey v. Musladin*, 549 U.S. 70, 77 (2006). And, in light of the record before the state court and the clearly established Supreme Court precedent, the state court decision must have been “objectively unreasonable,” and not merely incorrect in the view of the federal court. *Lett*, 559 U.S. at 773; *Richter*, 562 U.S. at 101–02; *see also Felkner v. Jackson*, 562 U.S. 594, 597–98 (2011) (per curiam). “[E]ven a strong case for relief does not mean the state court’s contrary conclusion was unreasonable.” *Richter*, 562 U.S. at 102.

The standard set forth in § 2254(d) is “difficult to meet . . . because it was meant to be.” *Id.*; *see also Burt v. Titlow*, 134 S. Ct. 10, 15–16 (2013) (“Recognizing the duty and ability of our state-court colleagues to adjudicate claims of constitutional wrong, AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court.”). It “reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal.” *Richter*, 562 U.S. at 102–03. To that end, it precludes review of any claims previously rejected on their merits by a state court except in the narrow category of cases “where there is no possibility fairminded jurists could disagree that the state court’s decision conflicts with [the Supreme] Court’s precedents.” *Id.* at 102. Accordingly, to overcome the bar of § 2254(d), a petitioner is required to show at the threshold that “the state court’s ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for

fairminded disagreement." *Id.* at 103; *see also Titlow*, 134 S. Ct. at 16 ("We will not lightly conclude that a State's criminal justice system has experienced the 'extreme malfunction' for which federal habeas relief is the remedy.") (quoting *Richter*, 562 U.S. at 102) (alteration omitted); *Johnson v. Williams*, 133 S. Ct. 1088, 1091, 1094 (2013) (standard of § 2254(d) is "difficult to meet" and "sharply limits the circumstances in which a federal court may issue a writ of habeas corpus to a state prisoner whose claim was 'adjudicated on the merits in State court proceedings'") (quoting 28 U.S.C. § 2254(d)).

Moreover,

> [i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

As for whether or not Liao suffered prejudice because of counsel's error, our first task therefore is to determine whether the Superior Court's application of the prejudice prong of *Strickland* as measured under § 2254(d) "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. 86 at 103. Specifically, does the Superior Court's conclusion that there was not a reasonable probability that the missing evidence

would have resulted in a different result in Liao's trial survive this rigorous test?

V

**Analysis**

We begin our evaluation with the State's admission during oral argument of the obvious: Liao was unmistakably prejudiced during his trial by the absence of both a sleep study and the additional information sought by Dr. Kushida. Counsel for the Warden agreed (1) that Dr. Kushida was "clobbered" on cross-examination, (2) that "his credibility was pretty much destroyed," and (3) that Liao thereby suffered prejudice during the trial in connection with the core of his defense. We quote Deputy Attorney General Ryan Smith's answers to our questions.

> Judge Pregerson: [Dr. Kushida's] credibility was pretty much destroyed by the cross examination.
>
> Mr. Smith:     Yes, sir. . . .
>
> Judge Trott:    She [the prosecutor] used the absence [of a sleep study] to clobber the expert witness [Dr. Kushida] . . .
>
> Mr. Smith:     Correct.
>
> Judge Trott:    Clobbered him.

Mr. Smith:      Correct. The point would be
                that still that the evidence of a
                sleep study, which is what we
                are looking at here, whether
                the absence of that prejudiced
                the petitioner in this case.

Judge Trott:    It did in the trial.

Mr. Smith:      It did in the trial because it
                was absent then, but now
                looking back [it did not].

Judge Trott:    If we look at the trial it did
                prejudice Liao.

Mr. Smith:      Correct, but now that we know
                what it is, it would not have
                helped him.

Dr. Sharma's rebuttal and the prosecutor's summation prove
the incontestable validity of counsel's concession regarding
the immediate effect of counsel's error on the trial. What was
the fatal flaw according to Dr. Sharma? The lack of a sleep
study.

Then, the prosecutor vouched for Dr. Sharma's testimony
in her summation to the jury, saying,

> [Dr. Sharma] was very – I think he was very
> professional about that. He could have said,
> you know, there is no evidence that the
> defendant is a sleepwalker or I don't think the
> defendant is a sleepwalker for X, Y, and Z

reasons. But he tells us there is *insufficient evidence*. Why? *Because there was no sleep study that was done*.

(Emphasis added.)

Why was there insufficient evidence to support Dr. Kushida's opinion and therefore Liao's defense? Because of counsel's pre-trial error.

However, the warden's counsel now describes Dr. Erman's sleep study as *discrediting* Dr. Kushida, not at all supporting his opinion. Counsel argues that had this sleep study been available during the trial, it would not have helped Liao – to the contrary. Therefore, he argues Liao suffered no prejudice.

> Judge Trott: Is it your point now . . . that the sleep studies themselves would have been used to destroy Dr. Kushida?
>
> Mr. Smith: Yes, that's absolutely correct, your honor.
>
> Judge Trott: That's your point?
>
> Mr. Smith: Yes, your Honor.

This counterintuitive argument, which is based on an outlandish portrayal of Dr. Erman's testimony, was not articulated in the State's responsive brief. It appears to have been manufactured for oral argument. In fact, the State's argument in its brief is *inconsistent* with what it asserted to us

during oral argument. In its brief, the State says that because "Dr. Kushida's opinion *was the same as Dr. Erman's . . .*," Dr. Erman's testimony was merely "cumulative" (emphasis added). This is the same mistake made by the magistrate judge, which we discuss in Section VII of this opinion. Moreover, the State contradicts itself. Merely cumulative information can hardly contradict the "same" information from another source.

The State's new argument is not only unconvincing, but it is patently irreconcilable with and contradicted by the record. Doctor Erman's detailed testimony as quoted earlier speaks for itself. Dr. Erman and Dr. Guilleminault looked at the objective measurable results of the sleep study and concluded that Liao was a sleepwalker. Their joint diagnosis would not only have corroborated Dr. Kushida's opinion, but it was largely predicated on objective criteria that amounted to *direct* medical evidence strongly tending to prove the validity of Liao's defense. This evidence was not just corroborative, and certainly more than cumulative. It was *direct* essential evidence of Liao's asserted unconscious state during the attack. It is inconceivable that the results of Dr. Erman's sleep study and testimony would have impeached Dr. Kushida. Any argument to the contrary defies reason. Moreover, if counsel had Dr. Erman's and Dr. Guilleminault's testimony available at Liao's trial, we firmly believe that they would have likely been called as witnesses before Dr. Kushida took the stand. Why? Because they had what Dr. Kushida lacked: The objective results of a sleep study.

The argument that the sleep study actually damaged Dr. Kushida's testimony is spurious to the point of being absurd. To call this argument "unreasonable" is to be charitable. We

hesitate to be blunt, but AEDPA's standard of review demands more than polite disagreement. So be it. The State's claim that the prosecutor could have called Dr. Erman as a witness to destroy Dr. Kushida is fatuous.

The Superior Court's fact-driven finding that Liao suffered no prejudice evinces additional consequential errors which highlight the unreasonableness of its decision.

First, the court failed in its decision to acknowledge Dr. Erman and Dr. Guilleminault's sleepwalking diagnosis and the objective evidence supporting it. Instead, the court focused out of context on bits and pieces of Dr. Erman's testimony which the court regarded as diluting his diagnosis. In so doing, the court omitted Dr. Erman's explanation of why these fragments did *not* erode his diagnosis. We can only conclude that in considering Dr. Erman's testimony, the Superior Court did not recognize its full force and importance.

Second, the court opined that the lay evidence of Liao's sleepwalking offered during the trial by his relatives, plus Dr. Kushida's belittled opinion, were sufficient to establish Liao's defense, making Dr. Erman's evidence essentially unnecessary. Equating lay testimony on a medical subject with the testimony of two qualified doctors makes no sense, none. One doubts that there is a lawyer alive who, with doctors available to prove a medical condition, would use lay witnesses instead, especially in a criminal trial where a defendant needs only a reasonable doubt to prevail. Indeed, the prosecutor pointed out not only the weaknesses in Liao's relatives' testimonies, but that they were biased in his favor. She told the jury, "These women have biases. But, you know, what doesn't have a bias is the evidence." We agree, the

sleep study also would have had no bias. The Superior Court may have been impressed with the relatives' testimonies of sleepwalking, but the prosecutor certainly was not. Neither was the jury.

Third, the Superior Court inexplicably minimized the devastating effect of the absence of a sleep study on Dr. Kushida's testimony, referencing instead Dr. Kushida's defensive claim that a sleep study was optional. The court said, "The fact that Dr. Kushida was aggressively cross-examined is not a basis to grant a second opportunity to present its case but is something that happens in the search for truth." Liao doesn't complain about aggressive cross-examination per se, but that his counsel's error made the cross-examination brutally effective – as Dr. Sharma's rebuttal testimony undeniably demonstrates. We note that without a study, Dr. Kushida was left with only an opinion, not a diagnosis. Dr. Erman came forth with a diagnosis. Moreover, the Superior Court did not even mention Dr. Guilleminault, identified as the leading expert in his field.

Fourth, the Superior Court discredited the sleep study because it did not produce an episode of actual sleepwalking on Liao's part. The court said, "Obviously, if the sleep study had noted a full episode of sleepwalking, there would be no question that the outcome probably would have been different." This comment and expectation ignored what Dr. Kushida said in his April 8, 2003 letter to the court about what the study might show: "However, it is very unlikely to capture an actual sleepwalking episode by polysomnography . . . ."

Dr. Erman agreed with Dr Kushida.

(Dr. Erman) [W]e typically don't expect to see the full episodes of arousal in patients with good histories of these arousal disorders when they're in the lab.  It's very often as if part of the brain is functioning to – to keep an eye out on what is going on in these new surroundings.  When you add into that the circumstances of someone who's been incarcerated who knows guards are outside the room and who is shackled, the expectation would be that this would lighten fragment sleep; and we did see this, the sleep efficiencies for the two studies we did were both in the low range and 60% range.  We would ordinarily expect that to be in the high 80's [sic] to low 90's [sic].

The court simply discounted this unimpeached evidence and improperly substituted its flawed understanding of the expected results of a sleep study for those of qualified doctors.

Fifth, in discussing the facts surrounding the early morning attack, the court highlighted only those that might prove Liao was conscious and aware of what he was doing, omitting those that did not.  From these selected facts, the court concluded that in comparison to the defense, the prosecutor's case was strong.  What the court did not discuss were those *contemporaneous* facts offered by Henry Chen and his mother that strongly implied that Liao was *not* aware of what he was doing.  As indicated in Part I of this opinion, those facts are:

1) At midnight, just four hours before the attack, Li's sons Henry and Danny got into a fight. Liao helped Li separate them, and when Li started to punish them, Liao intervened on their behalf and asked her not to do so.

2) Within seconds of the attack, when Chen asked Liao what he was doing, Liao did not reply. Liao appeared to be in shock.

> Q  What do you mean by that, he seemed to be shocked?

> A  (Henry Chen) Like open his mouth and just looking at me.

> Q  Sorry? Open mouth, and what else?

> A  (Henry Chen) And staring at me.

3) When Li asked Liao immediately after the attack why he hit Chen, Liao repeatedly said, "Why did I do it?" His answer was that he had a dream someone was hitting him and he was fighting back.

4) Immediately after the attack, Liao assisted Li to tend to her son's wounds.

> Q  What was [Liao] doing?

> A  (Li) Nothing. Walking back and forth. And also he was calling 911.

> . . . .

Q   Was he helping you and your son that
    evening?

A   Yes.

Q   And how was he helping you and your
    son?

A   He asked me to examine my son's injury
    and to put something over the injury to
    stop the bleeding.

Q   Did he seem concerned about your son
    and his injury?

. . . .

A   Yes.  He was trembling all over at seeing
    my son's bleeding.

  5) Liao did not flee, he called the police and
     accompanied Li and Chen to the hospital.

In other words, Dr. Erman and Dr. Guilleminault's diagnosis
would not have existed in a vacuum, but would have served
to explain and to interpret Liao's behavior that was not
consistent with trying to murder Li's son with premeditation.

    We are acutely aware that the Superior Court need not
have referred to or addressed in its statement of decision all
the facts weighing on this issue.  But in this case, the facts
omitted from the court's discussion are so glaring and
essential to a proper weighing and evaluation of the evidence
that when exposed and viewed in context, they render

objectively unreasonable the court's conclusion that because the prosecution had a strong case, Liao did not suffer any prejudice. With all respect to our colleague on the Superior Court, we do not see how any "fairminded jurist" could have arrived at such a faulty determination. *Davis v. Ayala*, 135 S.Ct. 2187, 2199 (2015). We regret the use of such harsh language, but as the State repeatedly demands, we must adhere to the Supreme Court's articulation of our strict standard of review.

## VI

The Superior Court's fact-based decision that Liao suffered no prejudice from his counsel's error was not just merely incorrect, but "objectively unreasonable." *Lett*, 559 U.S. at 773; *see also Richter*, 562 U.S. at 101–02. What is more, the Superior Court's application of *Strickland* to the facts of this case also was unreasonable as that term has been construed in this context by the United States Supreme Court.

Thus, deference to the state's decision is not applicable. *Milke v. Ryan*, 711 F.3d 998, 1008 (9th Cir. 2013). Therefore, we look de novo at this issue.

From this perspective, we note that our precedent recognizes that prejudice is established when, as Liao's counsel argues, "counsel's error left the defense with weaknesses that were exploited by the prosecution."

In *Brown v. Myers*, 137 F.3d 1154 (9th Cir. 1998), for example, counsel's error was his failure to call available witnesses who could have corroborated his client's alibi defense. We said,

> The district court concluded that the alibi witnesses would not have helped Melvin at trial because their testimony during the evidentiary hearing was vague with regard to time. Their testimony, however, was consistent with Melvin's account that he arrived at Saunders' house too early to have participated in the shooting. Because their testimony buttressed Melvin's account on this crucial point, it creates a reasonable probability that the fact-finder would have entertained a reasonable doubt concerning guilt. As it was, without any corroborating witnesses, Melvin's bare testimony left him without any effective defense.

*Id.* at 1157–58 (citations omitted).

We came to a similar conclusion in *Luna v. Cambra*, 306 F.3d 954 *amended in* 311 F.3d 928 (9th Cir. 2002), another case involving a failure of trial counsel to call known alibi witnesses to corroborate his client's testimony. Citing *Brown*, we determined that counsel's error prejudiced Luna because without corroborating witnesses, his "bare testimony left him without any effective defense." *Luna*, 306 F.3d at 961 (quoting *Brown*, 137 F.3d at 1158).

The validity of our precedents as they relate to this appeal finds support in a recent Supreme Court case, *Hinton v. Alabama*, 134 S. Ct. 1081 (2014). The Court said that a defendant could well be prejudiced by his attorney's failure to secure an expert witness on a scientific issue if "there is a reasonable probability that . . . [the] expert . . . would have instilled in the jury a reasonable doubt as to [his client's] guilt

. . . ." *Id.* at 1089. The Court could easily have been talking about Dr. Erman.

## VII

The magistrate judge's decision was similarly flawed. The decision erroneously labeled Dr. Erman's testimony as well as the results of the sleep study "merely cumulative." This label betrays a serious misunderstanding of the difference between direct and corroborating evidence, on one hand, and evidence that unnecessarily proves a point already sufficiently established, on the other. Black's Law Dictionary defines cumulative evidence as "[a]dditional evidence that supports a fact established by the existing evidence (esp. that which does not need further support)." Evidence, Black's Law Dictionary (10th ed. 2014). Corroborative evidence, on the other hand, is "[e]vidence that differs from but strengthens or confirms what other evidence shows (esp. that which needs support)." *Id.* Articulating these definitions exposes the fatal error in degrading Dr. Erman's and Dr. Guilleminault's input and the sleep study results to unnecessary surplusage.

## VIII

Contrary to the State's claim that we are improperly second-guessing a reasonable state court decision, we are not. Neither are we merely quibbling or disagreeing with our state court colleagues. We are simply performing the function that federal law requires: To guard against the illegal and unconstitutional confinement by a state of an individual entitled to the benefits of the rule of law. Performing this task, we conclude that the presumption of correctness

afforded to the state court's decision has been shattered by clear and convincing evidence.

Liao spent years in prison without having had a fair trial. His attorney's serious mistake, triggered by an equally grievous error by a court clerk, eviscerated a viable defense of unconsciousness. His conviction represents an extreme malfunction of justice caused by a violation of his Sixth Amendment right to competent and effective counsel, a violation which the State does not dispute. This error was anything and everything but harmless.

## IX

Liao has served his time in prison and is currently on parole. It is difficult to conceive of circumstances under which the State would again take him before a jury. Nevertheless, as is our practice and authority, we reverse the decision of the District Court and remand with instructions to grant a conditional writ of habeas corpus ordering Liao's release from all forms of custody unless the State of California elects within 90 days of the issuance of the mandate to retry him. Any such retrial shall commence within a reasonable time thereafter to be set by the District Court.

**REVERSED AND REMANDED.**